## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| AMERICAN MEDICAL ASSOCIATION, MEDICAL SOCIETY OF NEW JERSEY, and WASHINGTON STATE MEDICAL ASSOCIATION, each in an associational capacity on behalf of its members, JILL STEWART, MARIA C. PLUMACHER and JORGE CARDONA (as Attorney-in-Fact and representative of Lady Montoya Marin), individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CIGNA CORPORATION and CIGNA HEALTH AND LIFE INSURANCE COMPANY,<br><br>Defendants. | Case No. 3:22-cv-00769-OAW<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED ON ALL CLAIMS SO TRIABLE** |

Plaintiffs American Medical Association ("AMA"), Medical Society of New Jersey ("MSNJ"), and Washington State Medical Association ("WSMA"), all in an associational capacity on behalf of their members in New Jersey and Washington State (collectively, the "Association Plaintiffs"), and as representatives of the Litigation Center of the American Medical Association and State Medical Societies ("Litigation Center"), and Jill Stewart ("Stewart"), Maria C. Plumacher ("Plumacher"), and Jorge Cardona as Attorney-in-Fact and representative of his mother, Lady Montoya Marin ("Cardona," and along with Stewart and Plumacher, the "Class Representatives"), individually and on behalf of all others similarly situated, bring the following complaint against Defendants Cigna Corporation and Cigna Health and Life Insurance Company (collectively "Cigna" or "Defendants").

## I.    <u>INTRODUCTION</u>

1.      Cigna is in the business of administering health plans, many of which are governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq*. ("ERISA"). As such, it is an ERISA fiduciary.

2.      The written terms of those ERISA plans (the "Cigna Plans") state that plan members, including the Class Representatives, are entitled to receive covered health care services from providers who fall into one of two categories: in-network ("Participating Providers"), meaning that they have entered into direct or indirect contracts with Cigna to accept discounted rates as payment in full in exchange for being given access to treat Cigna insureds; or out-of-network ("Non-Participating Providers") providers, who have not entered into such contracts and have not agreed to accept discounted rates as payment in full.

3.      The Cigna Plans state that, for covered services provided by Participating Providers, the plan will pay the rate set out in a "direct or indirect" contract that Cigna has with that provider. Only when there is no such contract—i.e., the provider is a Non-Participating Provider—do the plans call for a different and lower reimbursement methodology to be utilized.

4.      MultiPlan Corp. ("MultiPlan") is the country's largest "third-party network" company. Across its networks, it has entered into contracts ("MultiPlan Contracts") with over 1.2 million providers, pursuant to which the provider has agreed to accept a set percentage of its billed charges as payment in full, which means the provider agrees not to hold the patient liable for the difference between the original billed charges and the discounted rate.

5.      By entering into a MultiPlan Contract, the provider becomes part of a "MultiPlan Network." MultiPlan, in turn, enters into contracts with its clients, health benefit plan issuers, and claims administrators like Cigna, to provide them access to a MultiPlan Network. Through this

process, the providers who join a MultiPlan Network "indirectly" contract with MultiPlan's clients.

6.     Cigna is a MultiPlan client that has contracted to gain access to a MultiPlan Network. One way in which Cigna communicates its relationship with MultiPlan to its insureds (and the providers who treat them) is by the placement of a MultiPlan logo on insurance cards Cigna issues to members of Cigna Plans.

7.     Cigna's contractual relationship with MultiPlan is also reflected in the fact that, at times, Cigna applies the contracted rates from MultiPlan Contracts when processing claims. At other times, however, it does not. This case is about the claims for which Cigna fails to apply the contracted rate.

8.     Because providers who are part of a MultiPlan Network satisfy the definition of "Participating Providers" pursuant to the written terms of the Cigna Plans, ERISA requires Cigna, as the fiduciary administrator of those plans, to cause those plans to pay benefits for services received from those providers based on the MultiPlan Contracts. This is mandated not only by the written terms of the Cigna Plans, but also by Cigna's fiduciary duty of loyalty to plan members. The MultiPlan Contracts prohibit providers from billing patients for the difference between the original billed charges and the discounted rates (the "balance of the bill"), and it is in those patients' interests to have those contracts applied. Conversely, when Cigna disregards the MultiPlan Contract that protection does not exist.

9.     That is what happened when Cigna processed the Class Representatives' claims at issue here. Instead of applying the MultiPlan Contracts because services were received from a Participating Provider as defined by the plans' written terms, Cigna applied the plan's lower

reimbursement methodology for Non-Participating Providers, leaving the Class Representatives exposed to the threat of balance billing.

10.     By engaging in this misconduct, Cigna underpaid the Class Representatives' claims. It also breached its fiduciary duties, including its duty to honor written plan terms and its duty of loyalty, because its conduct serves Cigna's own economic self-interest and elevates Cigna's interests above the interests of plan member patients.

11.     For fully-insured Cigna Plans, in which Cigna both administers the Plans, receives premium payments from the insureds, and then pays the medical expenses out of its own corporate assets, Cigna's self-interest is obvious—the less it pays in benefits, the more money it keeps.

12.     For self-funded Cigna Plans like those of the Class Representatives, in which Cigna administers the Plans on behalf of Plan sponsors or employers who pay the medical expenses out of their own assets, Cigna's misconduct advances its self-interest because it allows Cigna to receive higher administrative fees. Under its contracts with the employers who establish a self-funded plan, Cigna receives a "savings" fee, payable by its self-funded customers, that is larger when Cigna causes the Plan to pay less for a given claim. By paying less than the amount required by the MultiPlan Contract, Cigna increases the amount of "savings" it claims and the resulting fees it receives.

13.     Plaintiffs Stewart and Plumacher, and Ms. Montoya Marin, were each members of Cigna Plans. Each of them received health care services from providers who had entered into MultiPlan Contracts and who were thereby indirectly contracted with Cigna to provide services to Cigna insureds for discounted rates. Rather than applying the rates provided under the MultiPlan Contracts, however, Cigna caused the Class Representatives' Plans to pay far less in benefits. As

a result, the Class Representatives did not receive the benefits to which they were entitled, and they were exposed to the threat of balance billing.

14.     Internal appeals were filed on behalf of the three claimants. All of the appeals were denied. Thus, each of the Class Representatives exhausted their internal appeals and is entitled to bring this action under ERISA.

15.     In addition to harming patients like the Class Representatives, Cigna's misconduct harms providers. By placing the MultiPlan logo on insurance cards that Cigna issues to members of Cigna Plans, which Cigna knows and intends to be given to providers, Cigna represents that it will apply the MultiPlan Contracts. Providers with MultiPlan Contracts, in turn, review and rely on that representation. Because Cigna frequently refuses to honor the MultiPlan Contracts, however, this representation constitutes both a negligent misrepresentation and an unfair or deceptive act or practice. Further, Cigna regularly includes deceptive statements in its communications with Cigna members. Specifically, in its Explanation of Benefits ("EOBs") forms Cigna misrepresents that providers have agreed to accept a lower payment and that patients bear no additional financial responsibility. These deceptive EOBs damage the professional and business relationships between patients and physicians. As a result, the Association Plaintiffs bring this action on behalf of their members, seeking declaratory and injunctive relief.

## II.    **THE PARTIES**

### **Plaintiffs**

16.     Plaintiff AMA is an Illinois not-for-profit corporation headquartered in Chicago, Illinois. Since its founding in 1847, the AMA has played a crucial role in the development and practice of medicine in this country. It is the voice of organized medicine in the United States. The objectives of the AMA are to promote the art and science of medicine and the betterment of public health, including by supporting patient access to quality health care by assuring that insurance

5

companies pay for that care as the law requires. The AMA has been for many years, and is today, the largest professional association of physicians, residents, and medical students in the United States. All state medical associations and most major specialty medical societies are represented in the AMA House of Delegates and thus in the AMA's policy making process. AMA members practice and reside in all states, including New Jersey and Washington, and practice in all areas of medical specialization. The AMA regularly represents its members to protect the members' rights and their patients' rights before administrative agencies and legislatures and in litigation. Regarding litigation, the AMA sponsors the Litigation Center of the AMA and the State Medical Societies, a coalition among the AMA and the medical societies of each State, including New Jersey and Washington, whose purpose is to represent the viewpoint of organized medicine and to protect members and their patients in the courts.

17.     Plaintiff MSNJ is a New Jersey not-for-profit corporation organized and existing under the laws of the State of New Jersey and headquartered in Lawrenceville, New Jersey. Representing more than 8,000 physicians practicing in New Jersey, MSNJ was founded in 1766 and is the oldest professional society in the United States. In representing all medical disciplines, MSNJ advocates for the rights of patients and physicians alike, seeking the delivery of the highest quality medical care. Its stated mission is "[t]o promote the betterment of the public health and the science and the art of medicine, to enlighten public opinion in regard to the problems of medicine, and to safeguard the rights of the practitioners of medicine."

18.     Plaintiff WSMA is a Washington not-for-profit corporation headquartered in Seattle, Washington. With more than 12,000 members, WSMA is the largest physician professional association in Washington, and the only professional organization that represents the interests and priorities of all physicians in the state, across all specialties and practice settings.

19.     The Association Plaintiffs assert claims on behalf of their members and as representatives of the Litigation Center. The Litigation Center is the voice of America's medical profession in legal proceedings across the country. The mission of the Litigation Center is to represent the interests of the medical profession in the courts. It brings lawsuits, files amicus briefs, and otherwise provides support or becomes actively involved in litigation of general importance to physicians and patients.

20.     The Association Plaintiffs have associational standing on behalf of their members who have claims against Cigna for the violations alleged in this Amended Complaint. They seek appropriate declaratory and injunctive relief to redress Cigna's misconduct, as alleged herein.

21.     Plaintiff Stewart is a resident of Yakima, Washington, and was a participant in a self-funded ERISA health benefits plan issued through her employer, DaVita Kidney Care. Her employer engaged Cigna to serve as the claims administrator for the plan ("Stewart's Plan").

22.     Plaintiff Plumacher is a resident of Holmdel, New Jersey. She was a beneficiary under a self-funded ERISA health benefits plan through her husband's employer, Tropical Cheese Industries, Inc. Her plan ("Plumacher's Plan") engaged Cigna to serve as the claims administrator.

23.     Plaintiff Cardona currently resides in Kissimmee, Florida. His mother, Ms. Montoya Marin, resides in Roselle Park, New Jersey. Ms. Montoya Marin was a participant in a self-funded ERISA plan issued through her employer, Stanley Black & Decker, Inc., which engaged Cigna to serve as the claims administrator for the plan ("Montoya Marin's Plan"). Ms. Montoya Marin has signed a Durable Power of Attorney in which she has designated her son, Plaintiff Cardona, as her Attorney-in-Fact, with the power and authority to bring this action under ERISA in her name and on her behalf.

**Defendants**

24.     Defendant Cigna Corporation is a Connecticut corporation headquartered at 900 Cottage Grove Road, Bloomfield, Connecticut 06002. It provides insurance, administers health plans, and offers related products and services in the United States.

25.     Defendant Cigna Health and Life Insurance Company is a Connecticut corporation headquartered at the same location as defendant Cigna Corporation in Bloomfield, Connecticut.

26.     The Cigna Defendants, along with their affiliated companies and wholly owned and controlled subsidiaries, insure, underwrite, and administer health benefits plans. As the claims administrator that has been delegated discretionary authority and control over the underlying health benefits plans it administers, including the Class Representatives' Cigna Plans, Cigna is an ERISA fiduciary.

### III.     JURISDICTION AND VENUE

27.     Subject-matter jurisdiction is appropriate over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

28.     The Court has subject matter jurisdiction over the Association Plaintiffs' claims under 28 U.S.C. § 1332(a) (diversity jurisdiction), because the Association Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

29.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (c)(2). Both Defendants have their headquarters in this District and reside in this District. Moreover, Cigna issues and administers various ERISA health benefit plans in this District and makes coverage and benefits decisions for insureds who reside in this District.

### IV.     FACTUAL ALLEGATIONS

**Plaintiff Stewart**

      **Stewart's Plan**

30. Ms. Stewart receives her health care benefits from her employer. The written terms of Stewart's Plan provide benefits for covered health care services from both network and non-network providers.

31. Stewart's Plan specifies that "Cigna Health and Life Insurance Company (Cigna) provides claim administration services to the plan." As the party with delegated authority "to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan," including "the determination of whether a person is entitled to benefits under the plan, and the computation of any and all benefit payments," Cigna is an ERISA fiduciary to Stewart's Plan.

32. As a member of the Plan, Ms. Stewart received an insurance card which stated that the plan was "administered" by Cigna. The card further included a logo for "MultiPlan," reflecting both to Ms. Stewart and to the providers who reviewed the card that MultiPlan was part of the Cigna system.

33. Under Stewart's Plan, a member may select services from a Participating or Non-Participating Provider. The plan defines a "Participating Provider" to mean "a Hospital, a Physician or any other health care practitioner or entity that has a direct *or indirect* contractual arrangement with Cigna to provide covered services with regard to a particular plan under which the participant is covered." (Emphasis added.) Stewart's Plan uses the term Participating Provider interchangeably with "In-Network Provider."

34. The written terms of Stewart's Plan explain that when services are received from a Participating Provider, the Plan will pay 80% of the charges, with the member responsible for the remaining 20% as co-insurance. In other words, the Plan pays up to 80% of the contracted rate agreed to by Participating Providers. After a maximum out-of-pocket amount is reached, the Plan

pays claims at 100%. Under Stewart's Plan, a member who uses a Participating Provider is not subject to a balance-billing obligation.

35.     By contrast, Stewart's Plan uses a different reimbursement methodology for Out-of-Network services, called the "Maximum Reimbursable Charge" ("MRC"). Stewart's Plan states expressly that the MRC is "Not Applicable" to determining the reimbursement amount for In-Network covered services, like those that Ms. Stewart received here.

36.     Stewart's Plan describes the MRC as follows:

The Maximum Reimbursable Charge is determined based on the lesser of the provider's normal charge for a similar service or supply; or
A percentile of charges made by providers of such service or supply in the geographic area where it is received. These charges are compiled in a database we have selected.

37.     For Non-Participating Providers (a term the Plan uses interchangeably with "Out-of-Network Providers"), the written terms of Stewart's Plan state that the Plan will pay 50% of the MRC.

38.     The Plan further notes, when describing a Non-Participating Provider, that "[t]he provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles and coinsurance."

39.     Stewart's Plan encourages members to use Participating Providers whenever possible, stating, for example: "When you select a Participating Provider, this plan pays a greater share of the costs than if you select a non-Participating Provider."

**Dr. Schwaegler's and SSI's MultiPlan Contract**

40.     Ms. Stewart received care for her back pain from Dr. Paul E. Schwaegler, a Board-Certified Spine Surgeon who owns and is the Managing Member of Seattle Spine Institute PLLC ("SSI"), located in downtown Seattle. When Dr. Schwaegler provides medical services at SSI, he

bills for both his own professional fee and the SSI's facility fee using the same Taxpayer Identification Number ("TIN"). Unless otherwise indicated, "Dr. Schwaegler" is used herein to refer to both himself and his company, SSI.

41.     Per Dr. Schwaegler's policy and practice, his staff examined and copied Ms. Stewart's insurance card. Dr. Schwaegler understood the MultiPlan logo on Ms. Stewart's card to mean that Stewart's Plan agreed to accept and apply the rates of MultiPlan-contracted providers like Dr. Schwaegler.

42.     At the time Ms. Stewart received those services, Dr. Schwaegler, under the SSI name, had a negotiated fee contract with MultiPlan in which SSI, on Dr. Schwaegler's behalf, agreed:

> to accept payment-in-full for all non-network claims/bills submitted to benefit programs issued or administered by clients of MultiPlan (including its subsidiaries Viant and NCN) as follows:
>
> 10% off Billed Charges

\* \* \* \*

- . . . You retain the right to bill the patient (or other financially responsible party) for items not covered under the patient's benefit plan and for amounts such as deductibles, coinsurance, or co-payments, whenever applicable.

- By accepting this agreement, you represent that you are authorized to act on behalf of all physicians using the same TIN, and this agreement will apply to all such physicians.

**Ms. Stewart's Benefit Claims**

**SSI Facility Fee Claims**

43.     Ms. Stewart received surgery from Dr. Schwaegler at SSI on June 19, 2017. The billed charges for the operating room facility fees totaled $119,766.80. Cigna processed the claim on November 21, 2017 and reported the results to Ms. Stewart in an EOB.

44. In the EOB, Cigna reported that there was a "discount" totaling $61,759.67, leaving a total bill of $58,007.13. Of that amount, Cigna deemed $54,496.42 to be the "amount not covered," with the "covered amount" being only $3,510.71, reflecting what was paid to SSI.

45. The Cigna EOB defined "discount" as follows:

The amount you save by using a health care professional or facility (doctor, hospital, etc.) that belongs to a Cigna network. Cigna negotiates lower rates with its in-network doctors, hospitals and other facilities that help you save money. Using out-of-network providers will cost you more. If you go out-of-network for services, Cigna may be able to get you discounts through third-party vendor contracts.

46. This statement was false, as neither SSI nor Dr. Schwaegler had agreed to this so-called "discount." The only "discount" SSI (or Dr. Schwaegler) ever agreed to accept was the one in the MultiPlan Contract, but Cigna failed to apply the MultiPlan Contract when processing the claim. Instead, without negotiating any discount with SSI or Dr. Schwaegler, Cigna directed the claim to its agent, a company called Zelis, to unilaterally "re-price" the claim at an amount far lower than that called for by the MultiPlan Contract, and then Cigna caused Stewart's Plan to pay that lower amount. In doing so, Cigna violated the written terms of the Stewart Plan and breached its fiduciary duties under ERISA.

47. On behalf of Ms. Stewart, SSI appealed how Cigna processed the SSI facility fee claim by letter dated May 17, 2018. Among other things, SSI challenged Cigna's failure to apply its MultiPlan Contract as required by Stewart's Plan's written terms and pointed out that Cigna had appropriately applied the MultiPlan Contract for Ms. Stewart on three other occasions.

48. Cigna responded to SSI by letter dated May 31, 2018 to SSI's Seattle office. Cigna's response failed to address its failure to apply the MultiPlan Contract to this claim.

12

49.     Cigna reprocessed the claim twice, but each time failed to use the agreed-upon reimbursement rate in SSI's MultiPlan Contract. And the last EOB, issued on July 31, 2019, again incorrectly stated that Ms. Stewart owed nothing further.

50.     On January 22, 2020, an appeal was filed with Cigna concerning Ms. Stewart's claim. In addition to challenging Cigna's continued denial of coverage for certain operating room surgical supplies, the appeal letter asserted that "[t]he primary procedure remains grossly under-reimbursed." Among other things, the letter reiterated that any assertion that SSI or Dr. Schwaegler had agreed to a discounted rate from Zelis was false, adding that "Seattle Spine Institute has _not_ signed a pricing or negotiated discount agreement with (Zelis) for this claim." Thus, the appeal letter asked Cigna to "accept this letter as a formal appeal to reprocess this claim [to] allow full billed charges on the primary procedure 22558, as we have shown those charges are prevailing charges for that procedure."

51.     Cigna denied the appeal by letter to Ms. Stewart dated March 2, 2020, stating:

**Appeal Decision**
After reviewing the appeal submitted by Seattle Spine Institute PLLC, the original decision to apply vendor pricing to the outpatient facility services provided on June 19, 2017 is upheld.
                    * * * *
This decision was based on the following:
Our records indicate the bill processed according to a pricing review done by an outside vendor. We have confirmed with the provider that you are not responsible for the difference between the original billed amount and the discounted amount agreed to by the provider. If you are being billed for any amount above the discounted amount, other than your copay or customer amount, please return a copy of the bill and this letter to Cigna.

52.     This explanation by Cigna was false: SSI and Dr. Schwaegler had repeatedly confirmed to Cigna that it had never agreed to the so-called "discount" with the "outside vendor," i.e., Zelis.

53.     At the end of the letter, Cigna stated that "[t]his decision represents the final step of the internal appeal process," adding that "if your plan is governed by ERISA, you also have the right to bring legal action under Section 502(a) of ERISA within three (3) years."

### Dr. Schwaegler's Professional Fee Claims

54.     In addition to the facility fee claims submitted by SSI, Dr. Schwaegler, who performed the spinal surgery for Ms. Stewart, also submitted a claim for his professional fee, totaling $63,099.17.

55.     As with the facility fee, Cigna violated its fiduciary duties and the plan's written terms. It ignored the MultiPlan Contract, relied on a much lower re-priced amount provided to it by Zelis, and then paid that lower amount.

56.     Along with SSI, Dr. Schwaegler repeatedly sought to challenge the underpayment. Cigna repeatedly conceded that the plan owed more money, and Cigna repeatedly caused the plan to pay a little more money, but even after all that, it failed to pay the full amount actually called for the MultiPlan Contract and/or Stewart's Plan.

57.     By letter dated November 18, 2019, Dr. Schwaegler, through his billing company, sent a balance bill to Ms. Stewart for the unpaid portion of his bill, stating:

> We write to you today with respect to the spine surgical services provided to you by Dr. Paul Schwaegler on June 21, 2017.
>
> As you are aware, this claim has been processed 4 times over the past two years. The most recent processing was in September 2019. That processing resulted in an additional payment of $11,960.68. Please reference the table below summarizing the payments over the two-year period.

| | **Charges** | **$63,099.17** |
|---|---|---|
| **Claim Payments** | 8/21/2017 | $10,133.89 |
| | 11/15/2007 | $270.42 |
| | 11/6/2018 | $6,938.51 |

|  | 9/26/2019 | $11,960.68 |
|---|---|---|
| **Total Payments** | | $29,303.50 |
| **Outstanding** | | $33,795.67 |

As seen above, new processing leaves you with an outstanding balance of $33,795.67. Enclosed is a balance bill for that amount.

58.     After receiving the balance bill, Ms. Stewart appealed by letter dated March 6, 2020. The appeal letter challenged Cigna's processing of the claim, which left her "financially responsible for over 50% of the claim charges (over $30,000!)."

59.     In her appeal, Ms. Stewart noted Cigna's statement in her EOB that "if you go out-of-network for services, Cigna may be able to get your discounts through third-party vendor contracts." She then pointed out that, in fact, such a discount was available through the MultiPlan Contract, stating:

> Seattle Spine Institute (Dr. Schwaegler's practice) *does* have a third-party vendor contract that Cigna is aware of and is able to use. Specifically, Seattle Spine Institute has a discount contract with MultiPlan, a third-party vendor that Cigna works with. It is clear to me that Cigna is able to access this discount because it was **used by Cigna to process both other Seattle Spine Institute claims for the same surgery**:
>
> - Surgical assistant claim: Jeffery Fernandez, PA
> - Operating room claim: Seattle Spine Institute
>
> **Request**:
> Please accept this letter as an appeal to reprocess the above referenced claim. **Specifically, I request Cigna use the MultiPlan-Seattle Spine Institute discount agreement to process the claim.**
>
> - Cigna is able to access this discount.
> - Use of the MultiPlan agreement to process this claim would be consistent with processing of the other claims by the same provider for the same surgery.
> - Use of the MultiPlan agreement to process this claim would dramatically reduce my personal financial responsibility.

60.     Cigna denied Ms. Stewart's appeal by letter dated May 5, 2020, stating:

**Appeal Decision**
After reviewing your appeal, the original decision to apply Maximum Reimbursable Charge for the procedure codes 22612 (fusion of lower spine bones, posterior or posterolateral approach), 22633 (fusion of lower spine bones with removal of disc, posterior or posterolateral approach, single interspace and segment) and all other related services is upheld.

* * * *

The decision was based on the following:
We use a methodology similar to Medicare to determine reimbursement for the same or similar service within a geographic market. Because we don't have any information that supports a reason to pay more than the Maximum Reimbursable Charge, we won't pay anything more towards this claim.

61.     In its denial letter, Cigna confirmed that internal appeals had been exhausted and affirmed Ms. Stewart's right to bring legal action under Section 502(a) of ERISA within three years.

**Plaintiff Plumacher**

**Plumacher's Plan**

62.     The written terms of Plumacher's Plan provide benefits for covered health care services from both network and non-network providers. The relevant terms of Plumacher's Plan are substantively indistinguishable from the written terms of Stewart's Plan.

63.     Plumacher's Plan uses the term "network provider" interchangeably with the term Participating Provider. The Plan defines "Participating Provider," in relevant part, to include a provider "that has a direct or indirect contractual arrangement with Cigna to provide covered services."

64.     Plumacher's Plan states that "[w]hen the provider is a network provider, the covered expense is determined based on a fee agreed upon with the provider.… When the provider is not a network provider, the amount payable for a covered expense is determined based on the Maximum Reimbursable Charge."

**Dr. Drzala's MultiPlan Contract**

65.     Ms. Plumacher received care for her back pain from Mark R. Drzala, MD, who

practices in Summit, NJ. At the time services were received (and continuing through today), Dr.

Drzala had entered into a provider contract with MultiPlan which states that "the Contract Rate for

Covered Services rendered to Participants shall be equal to sixty-seven (67%) percent of Group's

Billed Charges, less any Co-payments, Deductibles, and Co-insurance, if any, as specified in the

Participant's Benefit Program."

**Ms. Plumacher's Benefit Claims**

66.     Per Dr. Drzala's policy and practice, Dr. Drzala's office examined and copied Ms.

Plumacher's insurance card. As with Ms. Stewart's card, Ms. Plumacher's card identified Cigna

as the "administer" of the plan and included the MultiPlan logo. Dr. Drzala understood the

MultiPlan logo on Ms. Plumacher's card to mean that Plumacher's Plan agreed to accept and apply

the rates of MultiPlan-contracted providers like him.

67.     After receiving pre-authorization from Cigna, Ms. Plumacher underwent two stages

of complex orthopedic surgery on September 11, 2018, performed by Dr. Drzala. The billed

charges for the surgery, based on Dr. Drzala's usual and customary rates, totaled $130,795.00.

68.     Cigna processed the claim on November 2, 2018 and issued an EOB which stated

that a "discount" had been taken off of the billed charges totaling $98,754.86, with an additional

"amount not covered" of $19,093.66. This left a total "covered amount" of only $12,946.48, of

which $396.74 was allocated to Ms. Plumacher as co-insurance. Thus, a total of only $12,549.74

was paid to Dr. Drzala.

69.     As with Ms. Stewart's EOB, this too was false, as Dr. Drzala had never agreed to

this "discount." The only "discount" Dr. Drzala ever agreed to accept was the one in the MultiPlan

Contract, which Cigna ignored. Instead, Cigna again allowed Zelis to unilaterally "re-price" such services at an amount far lower than those called for by the MultiPlan Contract, and then Cigna caused Plumacher's Plan to pay those lower amounts, in violation of the written terms of Plumacher's Plan and in breach of Cigna's fiduciary duties.

70.     An appeal of how Cigna processed the claim was filed on May 15, 2019. Among other things, the appeal challenged Cigna's failure to apply the MultiPlan Contract, stating:

> **<u>Claim Was Not Processed Correctly Per the MultiPlan Contract</u>**
> Dr. Drzala is a provider in the MultiPlan Network. Maria Plumacher's insurance card, issued by Cigna, indicates that the MultiPlan Network is applicable to plan participants. Dr. Drzala relied upon this representation contained on the insurance card in agreeing to provide services. Therefore, since the patient's benefit plan and our client participates in the MultiPlan Network **and** Cigna authorized the medically necessary services under authorization #IP0216666302, <u>reimbursement should have been based on Dr. Drzala' contacted rate, which is 67% of the provider's billed charges, less any applicable co-pays, coinsurance or deductibles</u>. *Aetna Life Ins. Co. v. Huntingdon Valley Surgery Center*, 129 F. Supp. 3d 160 (E.D. Pa. 2015). Instead, Cigna partially reimbursed them at an undisclosed, unilaterally selected nominal rate, breaching its contractual obligations under the MultiPlan agreement and damaging our client as a result.

71.     Cigna denied the appeal by letter to Ms. Plumacher dated July 6, 2019. Cigna denied the appeal on the reimbursement amounts. Cigna ignored the argument in the appeal that the MultiPlan Contract should be used to set reimbursement amounts, stating:

> We use a methodology similar to Medicare to determine reimbursement for the same or a similar service within a geographic market. Because we don't have any information that supports a reason to pay more than the Maximum Reimbursable Charge, we won't pay anything more towards this claim.

72.     Cigna then concluded: "This decision represents the final step of the internal appeal process. However, if your plan is governed by ERISA, you also have the right to bring legal action under Section 502(a) of ERISA within three (3) years."

**<u>Plaintiff Cardona</u>**

   **<u>Montoya Marin's Plan</u>**

18

73.     The written terms of Montoya Marin's Plan provide benefits for covered health care services from both network and non-network providers. The relevant terms of Montoya Marin's Plan are substantively indistinguishable from the written terms of Stewart's Plan and Plumacher's Plan.

74.     Like Stewart's Plan, Montoya Marin's Plan uses the term "Participating Provider" interchangeably with "In-Network Provider." The Plan defines the term "Participating Provider" to include a provider who has a direct or indirect contractual arrangement with Cigna to provide covered services and/or supplies, the Charges for which are Covered Expenses." The Plan defines "Charges" in relevant part as "the actual billed charges; except when Cigna has contracted directly or indirectly for a different amount."

75.     Like Stewart's Plan, Montoya Marin's Plan pays 80% of Covered Expenses for services provided by a Participating/In-Network Provider, and states that the MRC is "Not Applicable" to Participating Providers.

**Dr. Cooperman's MultiPlan Contract**

76.     Ms. Montoya Marin was treated by Dr. Ross Cooperman, who practices in Livingston, NJ. At the time services were received (and continuing through today), Dr. Cooperman had entered into a provider contract with MultiPlan which states that "the Contract Rate for Covered Services rendered to Participants shall be equal to eighty-five (85%) percentage of Group's Billed Charges, less any Co-payments, Deductibles, and Co-Insurance, if any, as specified in the Participant's Benefit Program."

**Ms. Montoya Marin's Benefit Claims**

77.     Per Dr. Cooperman's policy and practice, Dr. Cooperman's office examined and copied Ms. Montoya Marin's insurance card, which—as with the cards of Ms. Stewart and Ms.

19

Plumacher—identified Cigna as the "administer" of the plan and included the MultiPlan logo. Dr. Cooperman understood the MultiPlan logo on Ms. Montoya Marin's card to mean that Montoya Marin's Plan agreed to accept and apply the rates of MultiPlan-contracted providers like him.

78.     Ms. Montoya Marin underwent breast reconstruction surgery following treatment for breast cancer on June 8, 2020, performed by Dr. Cooperman. The billed charges for the surgery, based on Dr. Cooperman's usual and customary rates, totaled $158,602.00.

79.     Cigna processed the claim on October 1, 2020 and issued an EOB to Ms. Montoya Marin which stated that a "discount" had been taken off of the billed charges totaling $73,373.26, with an additional "amount not covered" of $83,602.00. This left a total "allowed amount" of only $1,626.74, of which half ($813.37) was Ms. Montoya Marin's responsibility as co-coinsurance. Cigna caused the plan to pay the remining $813.37 to Dr. Cooperman.

80.     In explaining how it processed the claim, Cigna cited to the "Discount"—which it defined in the same way as Stewart's and Plumacher's Plans—and stated: "**You saved $73,373.26.** CIGNA negotiates discounts with health care professionals and facilities to help you save money."

81.     Yet again, this EOB was false, as Dr. Cooperman had never agreed to this "discount." The only "discount" Dr. Cooperman ever agreed to accept was the one in the MultiPlan Contract, which Cigna continued to ignore. Instead, Cigna once more had Zelis unilaterally "re-price" such services at amount far lower than those called for by the MultiPlan Contract, and then Cigna caused Montoya Marin's Plan to pay those lower amounts. As with Ms. Stewart and Ms. Plumacher, through these actions Cigna violated the written terms of the underlying Plan and breached its fiduciary duties.

20

82.     On October 6, 2020, an appeal was filed that challenged how Cigna processed the claim. Cigna denied the appeal and refused to adjust the amount it caused Montoya Marin's Plan to pay.

83.     On January 22, 2021, a second appeal was filed for the Montoya Marin claim, using the Cigna-provided form.

84.     By letter dated February 23, 2021, Cigna denied the second appeal. This time it stated: "**Appeal Decision:** Unfortunately, we're unable to review this appeal. Our records show you've exhausted – or used up all of the appeal levels allowed."

### Cigna Breached Its ERISA Fiduciary Duties

85.     Cigna's adjudication of the benefit claims submitted on behalf of Ms. Stewart, Ms. Plumacher, and Ms. Montoya Marin not only breached the terms of their respective Cigna Plans, but also violated Cigna's fiduciary duties under ERISA, including a breach of Cigna's duty of loyalty.

86.     On information and belief, Cigna's administrative service contracts with its employer customers, including Ms. Stewart, Ms. Plumacher, and Ms. Montoya Marin's employers, allow Cigna to claim a "savings fee" when it reduces payments that the plan is otherwise required to make. That fee is measured as a percentage (usually around 30%) of the difference between the billed charge and the allowed amount set by Cigna. Thus, the more Cigna reduces the allowed amount, the more it increases its savings fee.

87.     Here, Cigna ignored the MultiPlan Contracts and paid far smaller amount in order to increase its "savings fees." In doing so it obviously benefited itself, and it did so at the expense of Plaintiffs. By ignoring the MultiPlan Contracts, Cigna left the Class Representatives exposed to the threat of balance billing.

**ALLEGATIONS OF THE ASSOCIATION PLAINTIFFS**

88.     Most of the members of the AMA, WSMA, and MSNJ are active physicians. Dr. Schwaegler is a member of both the AMA and WSMA, and Dr. Cooperman is a member of both the AMA and MSNJ.

89.     Many of the members of the Association Plaintiffs have executed MultiPlan Contracts, including Dr. Schwaegler and Dr. Cooperman.

90.     Many of the Association Plaintiffs' members with MultiPlan Contracts have treated patients who, like the Class Representatives, are covered by Cigna Plans.

91.     Cigna has violated Washington and New Jersey law with respect to providers who are parties to MultiPlan Contracts and have submitted claims on behalf of Cigna insureds.

92.     Cigna made misleading or negligent misrepresentations to providers. By placing the MultiPlan logo on its insurance cards—which Cigna knows providers routinely request, copy, and examine—Cigna represents and promises to providers that they accept MultiPlan. Cigna knew or should have known that providers would reasonably understand and rely upon that representation and promise to mean that Cigna would pay benefits according to the rates in the MultiPlan Contracts when processing claims. Cigna expects providers to rely on its representation.

93.     By ignoring the MultiPlan Contracts, and then lying on EOBs to the insureds about their liability for the unpaid portion of the billed charges, Cigna, without justification or excuse, interferes with and undermines the professional and business relationship between patients and physicians.

94.     MultiPlan has publicly confirmed that the purpose of its contracts with providers is to steer insureds of companies like Cigna to providers who are in a MultiPlan Network. Cigna entered into its relationship with MultiPlan to benefit from such steerage and take advantages of a

MultiPlan Network, using information Cigna obtains from MultiPlan concerning the providers with whom it has contracted. As MultiPlan states in its 2021 Form 10-K:

> **Network-Based Services**
> Our Network-Based Services reduce the per-unit cost of claims through contracts with over 1.2 million healthcare providers and facilities that establish discounts with member protection from balance billing in exchange for patient steerage and other provider-friendly terms and conditions. These services generally are used first in a solution hierarchy with members actively steered to participating providers through online and other directories. The services leverage our extensive network development, credentialing and data management capabilities as well as a sophisticated transaction engine that matches rendering provider information on the claim to the correct network contract so the discount can be applied. We offer a variety of network configurations to support all types and sizes of health plans, generally used as either the primary network, or as a complement to another primary network.

95.     Cigna's conduct has also violated Washington and New Jersey law through its actions as detailed herein. Not only does Cigna ignore the MultiPlan Contracts that providers have entered into when processing claims, but it falsely tells patients that their providers have agreed to reimbursement rates below the MultiPlan Contract rate, when providers have not so agreed. Cigna uses misrepresentations to patients about their providers as a means to pressure providers to agree to those discounted rates. Cigna does so, at the expense of its insureds and their providers, in order to maximize its own profits through exorbitant and unreasonable "savings fees" (as to self-funded plans) and reduced benefit payments (as to fully insured plans).

**CLASS ALLEGATIONS**

96.     Cigna administers numerous ERISA Plans with written plan language that is materially indistinguishable from the Class Representatives' Plans, as alleged herein.

97.     MultiPlan has entered into a contractual relationship with Cigna, pursuant to which providers who have entered into MultiPlan Contracts have, under the terms of the Cigna Plans,

"indirectly contracted" with Cigna to provide health care services to Cigna insureds at discounted rates.

98.     There was nothing unique about the way Cigna adjudicated the Class Representatives' claims. Instead, Cigna engaged in similar misconduct with respect to numerous ERISA beneficiaries covered under comparable Cigna Plans.

99.     Whether adjudicating claims under self-funded Cigna Plans (under which it seeks to increase its "savings" fee) or fully insured Cigna Plans (under which it seeks to pay out less in benefits), Cigna serves its own economic self-interest by ignoring plan terms that require it to reimburse providers according to the MultiPlan Contracts, and instead reimbursing providers with MultiPlan Contracts below the rates set by those contracts.

100.    As a result, Plaintiffs bring claims on behalf of a class (the "Class") defined as follows:

> All persons in the United States who were insured under a Cigna Plan that is governed by ERISA and who received healthcare services from a provider that contracted indirectly with Cigna via a MultiPlan Contract, where the Cigna Plan requires that the allowed amount be based on the MultiPlan Contract, and where Cigna set the allowed amount for such services below the rate required by the MultiPlan Contract.

101.    The members of this proposed Class are so numerous as to make joinder of all members impractical. Although the precise number of Cigna insured impacted by Cigna's conduct is known only to Cigna and can be obtained during discovery, Cigna is one of the largest insurance companies in the United States and administers claims on behalf of millions of insureds. Moreover, MultiPlan has entered into contracts with more than 1.2 million providers nationwide, and many of them have submitted claims on behalf of Cigna members. It is therefore reasonable to assume that there are thousands of ERISA insureds who fall within the proposed Class.

102.    There are questions of law or fact common to the Class, including but not limited to whether, in setting the allowed amount for services provided by a provider with a MultiPlan Contract under a Cigna Plan that falls within the Class definition, Cigna is required to set the allowed amount based on the contracted rate in the MultiPlan Contract.

103.    The Class Representatives will fairly and adequately protect the interests of the members of the Class; are committed to the vigorous prosecution of this action; have retained counsel competent and experienced in class action litigation and the prosecution of ERISA claims; and have no interests antagonistic to or in conflict with those of the Class.

104.    Cigna has acted on grounds that apply generally to the Class, as Cigna has engaged in a uniform practice of reducing benefit payments below the level required by written terms of the Plans by ignoring the requirements of the MultiPlan Contracts.

105.    In its role as a claims administrator and ERISA fiduciary for the plans at issue, Cigna maintains records of when and how it receives, processes, pays, or refuses to pay claims for services of Participating Providers. Moreover, Cigna has records, or will have the ability to access such records, reflecting any agreements that it or any of its vendors have with Class members. Accordingly, the members of the Class can be readily and objectively ascertained through use of Cigna's records or the records Cigna can access from its vendors.

### COUNT I
### (Claim for Relief under ERISA, 29 U.S.C. § 1132(a)(1)(B) brought by the Class Representative Plaintiffs)

106.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

107.    This count is brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

108.    With respect to the Class, Cigna violated the written terms of Cigna Plans, as well as its fiduciary duties to honor written plan terms and to act in the best interests of its participants and beneficiaries, by setting the allowed amount for services at an amount below the contracted rate set by the applicable MultiPlan Contracts and thus underpaying benefits owed for claims for services provided to Class members.

109.    Cigna also violated its ERISA fiduciary duties, including its duty of loyalty, because its decision not to apply such higher rates reflected its elevation of its own interests, including its interest in earning larger fees that resulted from using reimbursement methodologies that paid less than amounts set by MultiPlan Contracts, and those of its employer customers above the interests of plan members, and the duty to act in accordance with the written terms of its ERISA plans.

**COUNT II**
**(Claim for Relief under ERISA, 29 U.S.C. § 1132(a)(3)(A)**
**brought by the Class Representative Plaintiffs)**

110.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

111.    This count is brought pursuant to ERISA, 29 U.S.C. § 1132(a)(3)(A), to enjoin Cigna's unlawful acts and practices, as detailed herein. The Class Representatives bring this claim only to the extent that the Court finds that the injunctive relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

**COUNT III**
**(Claim for Relief under ERISA, 29 U.S.C. § 1132(a)(3)(B)**
**brought by the Class Representative Plaintiffs)**

112.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

113.    This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B), to obtain appropriate equitable relief to redress Cigna's violation of ERISA and of its Plans. The Class Representatives bring this claim only to the extent that the Court finds that the equitable relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(3)(A).

## COUNT IV
### (Negligent Misrepresentation, brought by the Association Plaintiffs)

114.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

115.    In its role as claims administrator under its various health benefits plans, Cigna places the MultiPlan logo on the insurance cards that are distributed to Cigna members, to communicate that Cigna accepts MultiPlan Contracts when processing claims for Cigna members.

116.    Members of the AMA, MSNJ, and WSMA have entered into such MultiPlan Contracts, and have treated patients under Cigna Plans.

117.    Providers are reasonably foreseeable recipients of Cigna's representation because, as Cigna knows or should know, providers—including Dr. Schwaegler, Dr. Cooperman, and Dr. Drzala, as described herein—routinely request, copy, and examine the health insurance cards of patients who seek healthcare services from them.

118.    It is reasonable for a provider to rely on Cigna's placement of the MultiPlan logo on the health cards for Cigna Plans as communicating that, if they treat patients with such cards, Cigna will reimburse them according to their MultiPlan Contracts.

119.    In fact, contrary to its representation, Cigna unreasonably ignores the MultiPlan Contracts and sets the allowed amount far lower than what Cigna would pay if it paid the rate in the MultiPlan Contract.

120.    Providers rely to their detriment on Cigna's misrepresentations.

121.    Cigna's negligent misrepresentation injures providers who treat patients whose Cigna health insurance cards include the MultiPlan logo and who have entered into MultiPlan Contracts that Cigna refuses to apply, because the providers are under-reimbursed for their health care services and Cigna's conduct undermines the patient-physician relationship.

**COUNT V**
**(Claim for tortious interference with patient-physician contract and/or patient-physician relationship, brought by the Association Plaintiffs)**

122.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

123.    The providers each entered into a valid contract or had a reasonable economic expectancy when they agreed to provide medical services to Cigna members, based on the expectation that they would receive a reasonable reimbursement for their services.

124.    Cigna knew and understood that providers agreeing to offer health care services to Cigna members had entered into such contracts or had a reasonable economic expectancy.

125.    By defining "Participating Provider" in its plans as including providers with "indirect contracts" with Cigna and placing the MultiPlan logo on the insurance ID card, and then ignoring the MultiPlan Contracts in lieu of a reimbursement amount that was a fraction of what would otherwise be available under such Contracts, Cigna both interfered, and acted with intent to interfere, with the providers' contract or expectancy relating to the Cigna members.

126.    Similarly, when Cigna falsely represented on its EOBs that providers had agreed to "discounts," and that the Cigna members were therefore not responsible for the difference between billed charges and the improperly calculated allowed amounts, Cigna both interfered, and acted

with intent to interfere, with the providers' contract or expectancy relating to the Cigna members with regard to providers who had entered into MultiPlan Contracts.

127.    Cigna's interference with the providers' contracts or expectancy relating to Cigna's members was improper and based on false and misleading representations, which were designed to enhance Cigna's profits through artificially inflated savings fees at the expense of the providers and Cigna's own members.

128.    Through its misconduct, Cigna's actions also tortiously interfered with the patient-physician relationship, which is based on special recognition of the essential value of protecting the relationship of trust and treatment between a doctor and patient. By lying to the patient about the provider's agreed-upon payment and the patient's financial responsibility, Cigna knowingly and willfully interfered and damaged that special relationship.

**COUNT VI**
**(Promissory Estoppel,**
**brought by the Association Plaintiffs)**

129.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

130.    Cigna knows or should know that providers routinely request, copy, and examine the health insurance cards of patients who seek healthcare services from them.

131.    By placing the MultiPlan logo on its insurance cards that are distributed to Cigna Plan members, Cigna makes a clear and definite promise to providers with MultiPlan Contracts that it accepts the MultiPlan Contract when processing claims and will pay benefits at the MultiPlan Contract rate.

132.    Members of the AMA, WSMA, and MSNJ have entered into such MultiPlan Contracts, and have treated patients under Cigna Plans.

133.    Cigna makes its promise with the expectation that providers will rely on it to agree to treat patients insured by Cigna-administered plans.

134.    Providers reasonably rely to their detriment on Cigna's promise, whereby Cigna induces them to treat patients insured by Cigna-administered plans, but then ignores the MultiPlan Contract rate and reimburses providers at a rate significantly below the MultiPlan Contract rate.

**COUNT VII**
**(Violation of the Washington Consumer Protection Act, RCW 19.86.010, et seq., brought by the AMA and WSMA)**

135.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

136.    The AMA and WSMA, and their members, are persons within the meaning of the Consumer Protection Act.

137.    Through the activities alleged herein, Cigna is engaged in trade or commerce in Washington that directly or indirectly affects the people of the state of Washington.

138.    Members of the AMA and WSMA have entered into MultiPlan Contracts and have treated patients under Cigna Plans.

139.    By lying to its own members about (i) how their claims were processed, (ii) purported agreements by their providers with respect to so-called "discounts" from billed charges, and (iii) the members responsibility for unpaid charges, while refusing to apply MultiPlan Contracts, and thereby increasing its profits, Cigna engaged in unfair or deceptive acts or practices in violation of the Washington Consumer Protection Act.

140.    Cigna's misconduct is inherently unfair, unethical, oppressive, and unscrupulous, while causing substantial injury to patients and providers in the State of Washington.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Cigna as follows:

A.      Certifying the Class and appointing the three individual Plaintiffs as class representatives and Plaintiffs' counsel as Class Counsel;

B.      Declaring that Cigna violated its legal obligations in the manner described herein;

C.      On behalf of the Class Representatives and the Class, and the Association Plaintiffs, permanently enjoining Cigna from engaging in the misconduct described herein;

D.      On behalf of the Class Representatives and the Class, awarding benefits due, plus pre- and post-judgment interest, or ordering Cigna to re-adjudicate the benefit amounts and cause the full amount of benefits owed to be paid, based on the amounts required under the terms of the negotiated rate agreements that the Participating Providers with MultiPlan Contracts have entered into with Cigna or one of its vendors, plus pre- and post-judgment interest;

E.      On behalf of the Class Representatives and the Class, ordering Cigna to disgorge any profits it earned through the ERISA and plan violations detailed herein, to issue restitution for the losses suffered by Class Members as a result of such misconduct, and/or to order payment of an appropriate surcharge as necessary to make Class Members whole;

F.      Awarding Plaintiffs disbursements and expenses of this action, including reasonable attorney fees, in amounts to be determined by the Court; and

G.      Granting such other and further declaratory, equitable, or remedial relief as is just and proper.


DATED: September 12, 2022            _/s/ Elizabeth Acee_____
                                     Elizabeth K. Acee, Esq. (ct 20986)
                                     **BARCLAY DAMON LLP**
                                     545 Long Wharf Drive, Ninth Floor
                                     New Haven, CT 06511
                                     Tel. (203) 672-2659
                                     Fax (203) 654-3260
                                     eacee@barclaydamon.com

31

D. Brian Hufford, Esq. (*pro hac vice pending*)
Jason S. Cowart, Esq. (*pro hac vice pending*)
**ZUCKERMAN SPAEDER LLP**
485 Madison Avenue, 10th floor
New York, NY 10022
Tel. (212) 704-9660
Fax (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

Andrew N. Goldfarb, Esq. (*pro hac vice pending*)
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel. (202) 778-1800
Fax (202) 822-8106
agoldfarb@zuckerman.com

Leslie Howard, Esq. (*pro hac vice pending*)
**COHEN HOWARD, LLP**
766 Shrewsbury Avenue, Suite 200
Tinton Falls, NJ 07724
Tel. (732) 747-5202
lhoward@cohenhoward.com

*Counsel for Plaintiffs and the Putative Class*