# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| AMERICAN MEDICAL ASSOCIATION, MEDICAL SOCIETY OF NEW JERSEY, and WASHINGTON STATE MEDICAL ASSOCIATION, each in an associational capacity on behalf of its members, JILL STEWART, MARIA C. PLUMACHER, and JORGE CARDONA (as Attorney-in-Fact and representative of Lady Montoya Marin), individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CIGNA CORPORATION and CIGNA HEALTH AND LIFE INSURANCE COMPANY, <br><br> Defendants. | Case No. 3:22-cv-00769-OAW |

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 4

I.      SUMMARY OF THE PATIENT PLAINTIFFS' PLANS ..................................... 4

II.     PLAINTIFFS' BENEFIT CLAIMS ..................................................................... 7

LEGAL STANDARD ...................................................................................................... 11

ARGUMENT ................................................................................................................... 12

I.      THE COURT SHOULD NOT CONSIDER THE NON-PLAN DOCUMENTS
        SUBMITTED BY CIGNA BECAUSE THE FAC DOES NOT QUOTE THEM AND
        THEY ARE IRRELEVANT TO PLAINTIFFS' CLAIMS. ................................ 12

II.     PATIENT PLAINTIFFS PLAUSIBLY ALLEGE THAT CIGNA'S REFUSAL TO
        PAY THE MULTIPLAN RATE VIOLATED THE TERMS OF THEIR PLANS. ........ 14

        A.   Patient Plaintiffs' Proffered Interpretation of the Plans' Is Reasonable. .......... 14

        B.   Cigna's Contrary Plan Interpretation Is Unreasonable .................................... 16

             1.   *The Cigna-MultiPlan Agreement and other documents on which Cigna relies are not
                  Plan terms and are irrelevant.* ........................................................... 16

             2.   *Cigna's unreasonable Plan interpretation leaves important terms without meaning.* . 17

             3.   *Cigna's unreasonable interpretation cannot be squared with the fact that it sometimes
                  pays the MultiPlan rate.* ...................................................................... 18

III.    PATIENT PLAINTIFFS PLAUSIBLY ALLEGE BREACH OF FIDUCARY DUTY
        CLAIMS UNDER 29 U.S.C. § 1132(A)(3) ........................................................ 20

IV.     ASSOCIATION PLAINTIFFS PLAUSIBLY ALLEGE THEIR STATE LAW
        CLAIMS ............................................................................................................ 24

        A.   The Association Plaintiffs Have Standing ...................................................... 25

             1.   *Association Plaintiffs plausibly allege the threat of future harm* ................... 26

             2.   *Association Plaintiffs' claims do not require individual participation.* ............. 27

        B.   Association Plaintiffs Plausibly Allege That Cigna Is ..................................... 29

             1.   *Cigna's placement of the MultiPlan logo plausibly communicates to MultiPlan
                  providers that Cigna honors their MultiPlan Contracts.* ............................ 29

i

8524826.1

    2.    *Cigna's other arguments about Count IV also fail.*........................................... 31

   C.   Association Plaintiffs State a Claim for Tortious Interference......................... 34

   D.   The FAC states a claim under the WCPA. ...................................................... 37

   E.   The FAC Adequately Pleads a Claim for Promissory Estoppel. ..................... 38

CONCLUSION.................................................................................................................... 40

8524826.1

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alejandre v. Bull*,
   159 Wash. 2d 674 (Wash. 2007)...........................................................................34

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................11

*Atl. Neurosurgical v. MultiPlan, Inc.*,
   20-Civ. 10685 (LLS), 2022 WL 158658 (S.D.N.Y. Jan. 18, 2022) .......................32

*Baur v. Veneman*,
   352 F.3d 625 (2d Cir. 2003) ...............................................................................26

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................11

*Bondholder Comm. on Behalf of Owners of Quad Cities Reg'l Econ. Dev. Auth. First Mortg.*
   *Revenue Bonds Series 2013A v. Sauk Valley Student Hous., LLC*,
   No. CV177337MASLHG, 2019 WL 1864121 (D.N.J. Apr. 24, 2019)...................27

*Borrero v. United Healthcare of NY, Inc.*,
   610 F.3d 1296 (11th Cir. 2010) ..........................................................................28

*Brunoli v. Fred Brunoli & Sons*,
   993 F. Supp. 66 (D. Conn. 1997).........................................................................18

*Cal. Dep't of Toxic Substances Control v. Westside Delivery, LLC*,
   888 F.3d 1085 (9th Cir. 2018) ............................................................................15

*CardioNet, Inc. v. Cigna Health Corp.*,
   751 F.3d 165 (3d Cir. 2014) ...............................................................................38

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ...............................................................................12

*Chapman v. Priceline Grp., Inc.*,
   No. 3:15-CV-1519(RNC), 2017 WL 4366716 (D. Conn. Sept. 30, 2017).............18

*Chatlos Sys., Inc. v. Natl. Cash Register Corp.*,
   479 F. Supp. 738 (D.N.J. 1979), *aff'd in part, remanded in part on other grounds,* 635 F.2d
   1081 (3d Cir. 1980)............................................................................................32

*Corbit v. J.I. Case Co.*,
   424 P.2d 290 (Wash. 1967) ................................................................................38

*Corey v. Pierce County*,
    225 P.3d 367 (Wash. App. Div. 1 2010)...................................................................... 38

*Curtiss–Wright Corp. v. Schoonejongen*,
    514 U.S. 73 (1995)............................................................................................................ 14

*Devlin v. Empire Blue Cross & Blue Shield*,
    274 F.3d 76 (2d Cir. 2001) ....................................................................................... 21, 22

*Dewar v. Smith*,
    342 P.3d 328 (Wash. App. Div. 1 2015)...................................................................... 30

*Fairfield County Med. Ass'n v. United Healthcare of New Eng.*,
    985 F. Supp. 2d 262 (D. Conn. 2013), *aff'd as modified sub nom. Fairfield County Med. Ass'n v. United Healthcare of New Eng., Inc.*, 557 Fed. App'x. 53 (2d Cir. 2014) ............................ 26

*Faulkner v. Beer*,
    463 F.3d 130 (2d Cir. 2006) ......................................................................................... 13

*Fay v. Oxford Health Plan*,
    287 F.3d 96 (2d Cir. 2002) ........................................................................................... 14

*Fid. Eatontown, LLC v. Excellency Enter., LLC*,
    3:16-CV-3899-BRM-LHG, 2017 WL 2691417 (D.N.J. June 22, 2017)................................. 34

*Goldfarb v. Solimine*,
    245 A.3d 570 (N.J. 2021) ............................................................................................. 38

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
    105 Wash.2d 778 (1986)............................................................................................... 37

*Hatcho Corp. v. Della Pietra*,
    485 A.2d 1285 (Conn. 1985) ....................................................................................... 14

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
    571 U.S. 99 (2013)................................................................................................... 14, 16

*Humana Ins. Co. v. Tenet Health System*,
    1:16-CV-1450 AWI SAB, 2016 WL 5815907 (E.D. Cal. Oct. 4, 2016)................................. 27

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)....................................................................................................... 25

*In re Managed Care Litigation*,
    298 F. Supp. 2d 1259 (S.D. Fl. 2003) ......................................................................... 28

*Kelley-Ross & Assocs., Inc. v. Express Scripts, Inc.*,
    2022 WL 1908917 (W.D. Wash. June 3, 2022) ........................................................ 38

8524826.1

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan,*
    555 U.S. 285 (2009) ................................................................................................. 13, 16

*Kosovan v. Omni Ins. Co.,*
    496 P.3d 347 (Wash. App. Div. 2 2021) ................................................................. 37, 38

*Kuhns Bros. v. Fushi Int'l, Inc.,*
    No. 3:06CV1917 PCD, 2007 WL 2071622 (D. Conn. July 16, 2007) .......................... 14, 17

*L.I. Minimally Invasive v. MultiPlan,*
    Index No. 605520/2016, Dkt. 187 (NY Sup. Ct. Nassau Cnty. Apr. 24, 2020) ...................... 33

*Lines v. Hartford Fin. Servs. Grp. Inc.,*
    3:21-CV-00029 (KAD), 2022 WL 408820 (D. Conn. Feb. 10, 2022) ................................... 22

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................................ 26

*Malaker Corp. S'holders Protective Comm. v. First Jersey Nat'l Bank,*
    163 N.J. Super. 463 (App. Div. 1978) ............................................................................. 39

*Mangiafico v. Blumenthal,*
    471 F.3d 391 (2d Cir. 2006) ............................................................................................ 12

*Minerley v. Aetna,*
    2019 WL 2635991 (D.N.J. June 27, 2019) ....................................................................... 22

*N.Y. State Psychiatric Ass'n, Inc., v. UnitedHealth Group,*
    798 F.3d 125 (2d Cir. 2015) ............................................................................ 22, 25, 27, 28

*Nat'l Products, Inc. v. Arkon Resources, Inc.,*
    294 F. Supp. 3d 1042, 1049 (W.D. Wash. 2018),
    *aff'd*, 773 Fed. App'x. 377 (9th Cir. 2019) .................................................................... 37

*New Jersey Physicians v. President of the U.S.,*
    653 F.3d 234 (3d Cir. 2011) ............................................................................................ 28

*New Jersey Psychol. Ass'n v. MCC Behavioral Care, Inc.,*
    96-CV-3080, 1997 WL 33446538 (D.N.J. Sept. 17, 1997) .................................................. 36

*Noecker v. S. Cal. Lumber Indus. Welfare Fund,*
    2011 WL 13147419 (C.D. Cal. Feb. 25, 2011) .................................................................. 22

*Nostrame v. Santiago,*
    61 A.3d 893 (N.J. 2013) .................................................................................................. 35

*O'Shea v. First Manhattan Co. Thrift Plan & Tr.,*
    55 F.3d 109 (2d Cir. 1995) ............................................................................................. 18

*OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*,
    503 F. Supp. 2d 490 (D. Conn. 2007) ............................................................................ 12, 13

*Peck v. Imedia, Inc.*,
    679 A.2d 745 (N.J. App. Div. 1996) ........................................................................................ 39

*Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*,
    280 F.3d 278 (3d Cir. 2002) ........................................................................................... 27, 28

*Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v.*
    *Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) ..................................................................................................... 12

*Plastic Surgery Ctr., P.A. v. Cigna Health and Life Ins. Co.*,
    CV172055FLWDEA, 2018 WL 2441768 (D.N.J. May 31, 2018) .............................. 13, 30, 34

*Pleas v. City of Seattle*,
    774 P.2d 1158 (Wash. 1989) ............................................................................................ 34, 35

*Pop's Cones, Inc. v. Resorts Intern. Hotel, Inc.*,
    704 A.2d 1321 (N.J. Super. App. Div. 1998) ......................................................................... 39

*Printing Mart–Morristown v. Sharp Elecs. Corp.*,
    563 A.2d 31 (N.J. 1989) .......................................................................................................... 34

*Retired Chicago Police Ass'n v. City of Chicago*,
    76 F.3d 856 (7th Cir. 1996) .................................................................................................... 29

*Reynolds Metals Co. v. Alcan Inc.*,
    C04-0175RJB, 2006 WL 1169790 (W.D. Wash. May 1, 2006) ............................................. 34

*Roganti v. Metro. Life Ins. Co.*,
    786 F.3d 201 (2d Cir. 2015) .................................................................................................... 23

*Rothstein v. Am. Intl. Group, Inc.*,
    837 F.3d 195 (2d Cir. 2016) .................................................................................................... 20

*Sacerdote v. New York Univ.*,
    9 F.4th 95 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022) ..................................... 11, 12

*Schiff v. Liberty Mut. Fire Ins. Co.*,
    82554-2-I, 2022 WL 17246820 (Wash. App. Div. 1 Nov. 28, 2022) ..................................... 38

*SDK Troy Towers, LLC v. Troy Towers, Inc.*,
    A-3149-16T3, 2019 WL 612670 (N.J. Super. App. Div. Feb. 14, 2019) ............................... 39

*Singer v. Beach Trading Co.*,
    876 A.2d 885 (N.J. Super. App. Div. 2005) ........................................................................... 29

8524826.1

*SRC Const. Corp. of Monroe v. A. City Hous. Auth.*,
   935 F. Supp. 2d 796 (D.N.J. 2013) ................................................................... 33

*State St. Bank & Trust Co. v. Salovaara*,
   326 F.3d 130 (2d Cir. 2003) .......................................................................... 20

*Stolba v. Wells Fargo & Co.*,
   10-CV-6014 WJM MF, 2011 WL 3444078 (D.N.J. Aug. 8, 2011) ......................... 32

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ...................................................................................... 28

*Tacoma Auto Mall, Inc. v. Nissan N.A., Inc.*,
   279 P.3d 487 (Wash. App. Div. 2 2012) ............................................................ 40

*U.S. Fid. & Guar. Co. v. S.B. Phillips Co.*,
   359 F. Supp. 2d 189 (D. Conn. 2005) ................................................................ 17

*United Food and Com. Workers Union Local 751 v. Brown Grp., Inc.*,
   517 U.S. 544 (1996) ...................................................................................... 26

*US Airways, Inc. v. McCutchen*,
   569 U.S. 88 (2013) ................................................................................ 14, 24

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996) ...................................................................................... 21

*Westfield Park Homeowners' Ass'n, Inc. v. NVR, Inc.*,
   No. 1:06 CV 00507, 2007 WL 9774486 (N.D. Ohio Mar. 27, 2007) ...................... 27

## STATUTES

29 U.S.C. § 1104 ............................................................................... 20, 21, 24

29 U.S.C. § 1104(a)(1)(A) .................................................................................. 20

29 U.S.C. § 1104(a)(1)(B) .................................................................................. 20

29 U.S.C. § 1104(a)(1)(D) .................................................................................. 20

29 U.S.C. § 1132(a)(3) ...................................................................................... 21

## OTHER AUTHORITIES

Restatement (Second) of Torts § 767 (1979) ........................................................ 35

Wash. Rev. Code Ann. § 48.01.030 .................................................................... 37

8524826.1

**RULES**

Fed. R. Civ. P. 8(d) ................................................................................................................... 21

8524826.1

## INTRODUCTION

Cigna's motion to dismiss is a masterclass in misdirection. Cigna seeks dismissal of Plaintiffs' ERISA claims under 29 U.S.C. § 1132(a)(1)(B), but largely ignores the plans' actual written terms and the allegations in the First Amended Complaint ("FAC") about precisely how and why they were violated. Instead, to support arguments that are both inconsistent with the plans' actual terms and contravene bedrock ERISA principles such as the plan document rule and fiduciary duty of loyalty, Cigna relies on documents that Plaintiffs did not quote in the FAC and that do not contain the terms of ERISA plans. Indeed, the document at the heart of Cigna's motion is a confidential "statement of work" between Cigna and MultiPlan, Inc. (the "Cigna-MultiPlan Agreement"), which Plaintiffs indisputably *have never seen*. The Court cannot consider these extrinsic documents at this stage of the case.

The FAC plausibly alleges that Cigna underpaid benefits owed to three patients who are beneficiaries of Cigna-administered ERISA plans (the "Patient Plaintiffs"). These patients received health care from physicians that had entered into contracts with MultiPlan, Inc. ("MultiPlan Contracts"), pursuant to which the provider agreed to accept a discounted rate as payment in full (*i.e.*, the provider agreed not to "balance bill" the patient for the difference between the discounted rate and the provider's billed charge). To make the providers in the MultiPlan network available to Cigna members at discounted rates, Cigna, in turn, entered the confidential Cigna-MultiPlan Agreement.

Because (a)(1)(B) claims are governed by written plan terms, the FAC goes to great lengths to explain the way in which the terms of the Patient Plaintiffs' plans (the "Plans") promise to pay Plaintiffs the indirect contract rate. Among other things, the Plans' written terms unambiguously define providers with indirect agreements as "Participating Providers"; encourage Plan members

to be treated by "Participating Providers" because the Plans pays a greater share of the costs, use the term "Participating Provider" synonymously with the term "in-network providers" for purposes of the Plans' benefit schedules;  promise to reimburse providers who have contracts at their "negotiated" rates; and require providers paid their contractual rate to forgo any balance billing of the patient. Critically, the FAC alleges that Cigna sometimes reasonably interprets the Plans in precisely this manner—it pays the MultiPlan rate and triggers the ban on balance billing. The FAC also alleges, however, that on other occasions like those at issue here—and in order to line its own pockets by generating so-called "savings" fees—Cigna ignores that same Plan language, refuses to pay the MultiPlan Contract rate and instead pays a much lower rate that the provider has not agreed to accept, and thereby exposes the Patient Plaintiffs to the threat of balance billing.

Cigna's central argument for dismissal is that it can engage in this inconsistent and self-serving behavior because the secret Cigna-MultiPlan Agreement has a provision that allows Cigna to "choose" whether to "access" the agreements Multiplan has negotiated with physicians. Mot. at 1, 7. Cigna claims that it utilizes that discretion when it thinks the Multiplan Contract "rates are too high," Mot. at 8, and that it does so in order to "maintain affordable healthcare costs." Mot. at 13. In essence, Cigna admits that it has "indirect" agreements with the Patient Plaintiffs' providers, it just doesn't want to use them all the time. The problem for Cigna is that none of this is grounded in any written terms of the **Plans**, which are controlling pursuant to decades of ERISA jurisprudence. Cigna's argument also flies in the face of the FAC's allegation that Cigna's motivation was naked self-interest. Moreover, to the limited extent that Cigna offers any argument about the plans' actual written terms, it is incoherent. Cigna's reading renders the defined term "Participating Providers" entirely meaningless. Indeed, Cigna argues that the Plans cannot be read to equate Participating Providers with "in-network providers" for purposes of paying benefits, even

2

though it admits that it frequently pays the MultiPlan Contract rate and the Plans' written terms only allow such a contract rate to be paid to "in-network" providers. Patient Plaintiffs' (a)(1)(B) claim is at least ***plausible***, which is all that is required at this stage.

So too are Patient Plaintiffs' (a)(3) claims for breach of fiduciary duty, which are brought in the alternative to their (a)(1)(B) claim. Cigna's attempt to dismiss these claims is based on misstatements about the nature of ERISA's fiduciary duties, and is contrary to biding precedent that permits the Patient Plaintiffs to simultaneously plead both (a)(1)(B) and (a)(3) claims. But Cigna does not dispute that the FAC plausibly alleges that Cigna breached its fiduciary duty to honor plan terms and its duty of loyalty, and that Patient Plaintiffs are at least plausibly entitled to forms of equitable and injunctive relief available under (a)(3). Under controlling law, Patient Plaintiffs have met their pleading burden.

Cigna's attempt to dismiss the state-law claims of the American Medical Association ("AMA"), Medical Society of New Jersey ("MSNJ"), and Washington State Medical Association ("WSMA") (together, "Association Plaintiffs") rest on still more mischaracterizations of the allegations in the FAC and appliable legal standards. Cigna's factual assertions about what Association Plaintiffs' physician-members and their patients thought, understood, and believed are contrary to allegations in the FAC. None of these assertions are relevant. None can be resolved on a motion to dismiss. The FAC alleges three sets of facts that, along with the reasonable inferences they create, easily satisfy Association Plaintiffs' obligation to plead facts that plausibly establish the merits of their state law claims: (1) Cigna placed the MultiPlan logo on its members' insurance cards; (2) Cigna frequently pays the MultiPlan rate when a member has a card with such a logo and is treated by a physician with a MultiPlan contract; and (3) on other occasions, Cigna pays a much lower rate when a member has such a card and is treated by such a physician, in which case

8524826.1

Cigna sends an EOB to the patient stating falsely that the physician accepted the lower, non-MultiPlan rate, and that the patient cannot be balance billed. Moreover, because the claims are based on standardized representations contained on Cigna's insurance cards and in its EOBs, Association Plaintiffs' claims do not require the participation of all the associations' members.

The Court should see through Cigna's smokescreen of non-Plan materials, factual disputes, and mischaracterizations of the FAC's allegations and applicable law. Plaintiffs have plausibly alleged their ERISA and state-law claims. Cigna's motion to dismiss must be denied.

## FACTUAL BACKGROUND

### I.   SUMMARY OF THE PATIENT PLAINTIFFS' PLANS

The Patient Plaintiffs and their families were promised health insurance benefits by their employers as part of their compensation. FAC ¶¶ 13, 21-23, 30. The terms of these employment-related benefits are defined by a written Plan, funded by Plaintiffs and their employers, and administered by Cigna. *Id*. ¶¶ 1, 9, 30-31. It is undisputed that each Plan is governed by ERISA, and that Cigna serves as the Plans' claims administrator fiduciary. *Id*. ¶¶ 1, 32.

The relevant written terms of each Plan are materially identical. *Id*. ¶¶ 62, 73. Each entitles Plan members to receive care from in-network "Participating Providers," and out-of-network "non-Participating Providers." *Id*. ¶¶ 2, 33, 62-63, 73-74. A "Participating Provider" is defined as follows:

> **Participating Provider**
> The term Participating Provider means a hospital, a Physician or any other health care practitioner or entity that has a direct or indirect contractual arrangement with Cigna to provide covered services with regard to a particular plan under which the participant is covered.

8524826.1

FAC ¶ 2, 33; DaVita Plan (ECF No. 49-4) at 70.[1] Thus, the Plans divide the universe of providers into two categories: Participating Providers, who have direct *or indirect* contractual arrangements with Cigna, and non-Participating Providers, who do not. The Plans use the term "Participating Provider" interchangeably with "in-network provider." FAC ¶¶ 2, 33, 63, 74.

Each Plan also contains written terms establishing how much it will pay in benefits when services are received from an in- or out-of-network provider, although these terms are not separately defined. Plaintiff Stewart's Plan, for example, promises to pay 80% of the Covered Expenses (a term describing how much a Plan will pay in benefits before deductibles, co-pays, or co-insurance obligations are applied) for services provided by in-network providers. *Id*. ¶ 34. The remaining 20% of the Covered Expenses are allocated to the Plan member as co-insurance. *Id*. Importantly, Participating Providers must accept the in-network rate as payment in full: they cannot attempt to collect the unpaid portion of their expenses from Cigna Plan members—a practice known as "balance billing." *Id*. ¶¶ 2, 34.

By contrast, the Plans use a different payment methodology, called the "Maximum Reimbursable Charge" ("MRC"), for services provided by out-of-network, non-Participating Providers. There are two versions of the MRC in Cigna plans. The first one sets the reimbursed amount "based on the lesser of the provider's normal charge for a similar service or supply; or percentile of charges made by providers of such service or supply in the geographic area where the service is received" as in Stewart's Davita Plan and Cardona's SB&D Plans, *id*. ¶¶ 35-36, 64, 74-75; Davita Plan (ECF No. 49-4) at 15; SB&D Plan (ECF No. 49-5) at 15); and the second sets

---

[1] The SB&D and TC Plans contain definitions for a "Participating Provider" that are substantively the same. *See* SB&D Plan (ECF No. 49-5) at 75 ("The term Participating Provider means a person or entity that has a direct or indirect contractual arrangement with Cigna to provide covered services and/or supplies, the Charges for which are Covered Expenses"); *see also* TC Plan (ECF No. 49-6) at 56 (defining the term as "A Hospital, Doctor/Physician or any other health care practitioner or entity that has a direct or indirect contractual arrangement with Cigna to provide covered services with regard to a particular plan that covers you and your Dependents.").

the allowed amount based on a Medicare-based methodology, as in Plumacher's TC Plan. FAC ¶¶ 71; TC Plan (ECF No. 49-6) at 24. Thus, neither of the two options for calculating the MRC for out-of-network provider claims is the rate set by a direct or indirect contract. The Plans then cover a set percentage of the MRC. FAC ¶ 37, 75. Additionally, the Plans permit non-Participating Providers to "balance bill" Plan members. *Id*. ¶ 38; Davita Plan (ECF No. 49-4) at 15 ("The provider may bill you for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles and coinsurance."); SP&D Plan (ECF No. 49-4) at 15; TC Plan (ECF No. 49-6) at 24.

Under the Plans' benefit schedules, which describe the amounts the Plans will pay for covered services, the reimbursement formulas for Participating Providers and non-Participating Providers are mutually exclusive: Plaintiff Stewart's and Ms. Montoya Marin's Plans expressly stated that the MRC is "Not Applicable" to in-network providers, and Plaintiff Plumacher's Plan contained a similar term stating "[w]hen the provider is a network provider, the covered expense is determined based on a fee agreed upon with the provider. . . . When the provider is not a network provider, the amount payable for a covered expense is determined based on the Maximum Reimbursable Charge." FAC ¶¶ 35, 64, 75; TC Plan (ECF No. 49-6) at 24. Thus, as the Plans' administrator fiduciary, Cigna can apply the MRC calculation *if and only if* the provider is a non-Participating Provider—who, by definition, has no direct or indirect contract with Cigna.

Cigna can negotiate other rates with providers at any time. If Cigna reaches an agreement with a provider for a particular charge, then the Plans consider the provider a "Participating Provider" for that specific service because Cigna and the provider have entered a "direct or indirect contract," and thus pay the claim using the "in-network" methodology: the agreed-upon fee under such contract, *e.g.*, the provider's MultiPlan Contract. FAC ¶¶ 3, 74 (explaining that Montoya

Marin's Plan defined "Charges" as "the actual billed charges except when Cigna has contracted directly or indirectly for a different amount").

The Plans also rely on the important Participating/non-Participating Provider distinction in other respects. For example, each Plan begins by encouraging members to use Participating Providers whenever possible, stating: "When you select a Participating Provider, this Plan pays a greater share of the costs than if you select a non-Participating Provider. . . . Participating Providers are committed to providing you and your Dependents appropriate care while lowering medical costs." FAC ¶ 39; DaVita Plan (ECF No. 49-4) at 7; *see also* SB&D Plan (ECF No. 49-5) at 7.

## II.   PLAINTIFFS' BENEFIT CLAIMS

The Plans hired Cigna to serve as their claims administrator and create a network of participating providers that Plan members can visit and limit their out-of-pocket payments. Cigna, in turn, directly contracts with some providers who agree to such payment terms. Those providers form Cigna's direct network. Cigna also contracts with MultiPlan, a company which creates what are commonly called third-party "rental networks" through its MultiPlan Contracts with millions of providers across the nation ("MultiPlan providers"). FAC ¶¶ 4-6. Like Cigna's direct network, in exchange for accepting a set percentage of their billed charges as payment in full (the "MultiPlan rate"), MultiPlan providers agree they will not balance bill the Plans members. *Id.* ¶ 4. Cigna communicates its agreement to honor these MultiPlan Contracts by placing the MultiPlan logo on its Plan members' insurance cards. *Id.* ¶ 6.

Each of the Patient Plaintiffs received healthcare services from a MultiPlan provider. *Id.* ¶¶ 40-42, 65-76. That is, Dr. Schwaegler and Seattle Spine Institute ("SSI") (Stewart's provider), Dr. Drzala (Lockhart's provider), and Dr. Cooperman (Montoya Marin's provider), each had a contract with MultiPlan when they treated the Patient Plaintiffs and continuing through today. *See*

*id.* ¶¶ 42, 65, 76.[2] Before agreeing to treat the Patient Plaintiffs, each provider examined and copied the patients' Cigna insurance card containing the MultiPlan logo, and understood the logo to mean that Plaintiffs' Plans had agreed to pay the providers' MultiPlan rates. *Id.* ¶¶ 42, 66, 77.

Patient Plaintiffs' Plans required Cigna to treat the providers as "Participating Providers" and compensate them accordingly. *Id.* ¶ 8. And because the MultiPlan Contracts protect Plaintiffs against balance billing, it was in Patient Plaintiffs' best interests to have the MultiPlan rates applied to their claims. *Id.* Indeed, Cigna appropriately applied the MultiPlan rates to some of the claims submitted by patients. *Id.* ¶ 7. For example, Cigna reimbursed claims submitted by Plaintiff Stewart for medical services provided by Dr. Schwaegler and/or SSI at the negotiated MultiPlan Rate on three different occasions. *Id.* ¶ 47. Yet, for the benefit claims at issue in this case, Cigna disregarded the agreed-upon MultiPlan Contract rate and repriced the claim through an alternate methodology that resulted in a far lower reimbursement amount. *Id.* ¶¶ 43-46, 55, 68-69, 79-81.

Plaintiff Stewart received spinal surgery for which Dr. Schwaegler billed $63,099.17 and SSI billed $119,766.80. *Id.* ¶¶ 43, 54. In EOBs sent to Plaintiff Stewart, Cigna reported a "discount" totaling $61,759.67 for SSI's portion, *id.* ¶ 44, with only $3,510.71 of the remaining amount deemed to be "covered," and paid to SSI. *Id.* Cigna also repriced Dr. Schwaegler's bill, similarly reporting that it had secured a sizeable "discount" on Plaintiff Stewart's EOB. *Id.* In reporting such "discounts," which were far greater than the applicable MultiPlan discount, Cigna also represented that the providers were part of its network, defining "discount" as follows:

> The amount you save by using a health care professional or facility (doctor, hospital, etc.) that belongs to a Cigna network. Cigna negotiates lower rates with its in-network doctors, hospitals and other facilities that help you save money. Using out-of-network providers will cost you more. If you go out-of-network for

---

[2] Dr. Schwaegler is a member of both the AMA and WSMA, while Dr. Cooperman is a member of both the AMA and MSNJ. FAC ¶ 88.

8524826.1

services, Cigna may be able to get you discounts through third-party vendor contracts.

*Id.* ¶ 45.

The problem is that while SSI and Dr. Schwaegler had entered into an indirect contract with Cigna, they did so **only** through the MultiPlan Contract. But Cigna did not use that MultiPlan rate. *Id*. ¶¶ 46-47. Instead, Cigna issued a misleading EOB, applying a far higher discount that had **not** been agreed to by Dr. Schwaegler and SSI. *Id*. ¶ 44. The only discount Dr. Schwaegler and SSI had accepted was their negotiated rate with MultiPlan. *Id*. ¶ 46. Cigna's EOBs also falsely stated that Plaintiff Stewart had no remaining financial obligation to Dr. Schwaegler and SSI, even though that would only be true if the MultiPlan Contract was honored. *Id*. ¶ 49. By disregarding the MultiPlan Contract and repricing the claims, Cigna paid a fraction of what it was required to pay under the MultiPlan Contract and then issued a misleading EOB.

Dr. Schwaegler, SSI, and Plaintiff Stewart challenged Cigna's reimbursement scheme and false statements over multiple appeals. *Id*. ¶¶ 47, 50, 58. Yet Cigna still failed to pay the full amount due under the MultiPlan Contract (and Plaintiff Stewart's Plan). *Id*. ¶¶ 51-53, 56. As a result, to try to recoup the amount owed, Dr. Schwaegler and SSI sent a balance bill to Plaintiff Stewart for over $30,000. *Id*. ¶ 57. Cigna's conduct harmed Plaintiff Stewart—who has been unable to pay off the balance bill—and interfered with Dr. Schwaegler's physician-patient relationship with Plaintiff Stewart because it falsely called Dr. Schwaegler's right to balance bill into question.

Plaintiff Plumacher received a two-stage complex orthopedic surgery from Dr. Drzala after obtaining pre-authorization from Cigna, for which Dr. Drzala billed $130,795.00. *Id*. ¶ 67. Again, Cigna ignored the MultiPlan Contract and instead unilaterally repriced the claim reporting a false agreed-upon "discount" of $98,754.86 to which Dr. Drzala had never agreed. *Id*. ¶ 68. After further

9

deductions, Cigna paid Dr. Drzala only $12,549.74, an amount far lower than his MultiPlan rate. *Id*. ¶ 69. As with Plaintiff Stewart, Cigna sent an EOB to Plaintiff Plumacher which falsely claimed that Dr. Drzala had accepted the new discount. *Id*. In fact, Dr. Drzala had not accepted any discount besides what his MultiPlan Contract called for. *Id*. Cigna's conduct caused substantial harm to Plaintiff Plumacher and similarly interfered with the patient-physician relationship between Plaintiff Plumacher and Dr. Drzala.

Ms. Montoya Marin underwent breast reconstruction surgery with Dr. Cooperman, following her treatment for breast cancer. *Id*. ¶ 78. Dr. Cooperman billed $158,602.00 for the procedure. *Id*. As with the other Patient Plaintiffs, Cigna failed to apply Dr. Cooperman's MultiPlan rate and instead unilaterally repriced the claim applying a purported "discount" of $73,373.26, with an "amount not covered" of $83,602.00. *Id*. ¶ 79. Cigna paid Dr. Cooperman only $813.37. *Id*. As with the other two Patient Plaintiffs, Cigna's EOB misleadingly informed Ms. Montoya Marin that Dr. Cooperman had accepted the "discount." *Id*. ¶ 81. Like the other providers, however, Dr. Cooperman had not done so. *Id*. The only reduced rate Dr. Cooperman had ever agreed to accept was his MultiPlan rate. *Id*. Cigna's conduct exposed Ms. Montoya Marin to the threat of balance billing and interfered with her relationship with Dr. Cooperman. *Id*.

The FAC alleges that Cigna intentionally misread the Plans terms and disregarded the MultiPlan Contracts to further its own self-interest. This was because Cigna claims a "savings fee"—approximately 30% of the difference between a provider's billed charge and the amount paid by the plan—from its employer/plan sponsoring customers. *Id*. ¶ 86. Cigna therefore has a substantial incentive to pay providers as little as possible to increase the size of its fee. But this exposes Plan members to balance bills from which they would have been protected had Cigna applied the MultiPlan Contracts. *Id*. ¶ 87. And because Cigna misleads patients and physicians

10

about what "agreement" is being applied and whether balance billing is legal, it also harms providers by interfering with and damaging their relationships with their patients. Put simply, it makes it impossible to know how much the Plan will pay on a given claim, if the provider can reliably inform the patient what her payment obligation will be, and if the provider can balance bill the patient. *Id.* ¶¶ 93, 95.

The Association Plaintiffs are the voice of organized medicine nationally and within each respective state. *Id.* ¶¶ 16-19. They have members in all 50 states who have executed MultiPlan Contracts, who treat Cigna insureds whose insurance cards contain the MultiPlan logo, and who were exposed to Cigna's misconduct. *Id.* Among other things, they advocate for increased access to medical care by ensuring insurance companies follow through on their legal obligation to pay for that care. *Id.* Alleging Cigna's conduct violates state laws, Association Plaintiffs bring claims for negligent misrepresentation, tortious interference with contractual relations and/or business expectancy, promissory estoppel, and under the Washington Consumer Protection Act ("WCPA") on behalf of their members. *Id.* ¶¶ 106-140. They seek only injunctive and declaratory relief—not monetary damages—to redress Cigna's ongoing misconduct. *Id.* ¶ 140.

## LEGAL STANDARD

When assessing Cigna's motion to dismiss the FAC, the Court must construe the complaint favorably, and must accept "all factual allegations therein as true and dra[w] all reasonable inferences in the plaintiffs' favor." *Sacerdote v. New York Univ.*, 9 F.4th 95, 106-07 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022). The complaint need not contain detailed factual allegations, merely "sufficient factual matter . . . to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is facially plausible as long as it "allows the court to draw the reasonable

8524826.1

inference that the defendant is liable for the misconduct alleged." *Id.* ERISA plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Sacerdote*, 9 F.4th at 106-07 (quotation and citation omitted). Thus, "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct. *Id.* at 107.

**ARGUMENT**

I.     <u>**THE COURT SHOULD NOT CONSIDER THE NON-PLAN DOCUMENTS SUBMITTED BY CIGNA BECAUSE THE FAC DOES NOT QUOTE THEM AND THEY ARE IRRELEVANT TO PLAINTIFFS' CLAIMS.**</u>

Cigna's motion relies heavily on documents the Court may not consider. When deciding a motion to dismiss, the Court may only consider a document not included with the complaint if it is "integral to the complaint." *OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 497 (D. Conn. 2007). A document is integral "where the complaint relies heavily upon its terms ***and*** effect." *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006) (emphasis added).

Here, Cigna attaches the Cigna-MultiPlan Agreement (or at least a portion of it) and some screen shots of the Cigna website, but the FAC does not quote from any of these documents and nothing in the FAC states or implies that Plaintiffs have even seen them, much less relied upon their terms in drafting the FAC. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002) ("[A] plaintiff's ***reliance*** on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough.") (emphasis added).

Cigna also cherry-picks what to show the Court. The document that Cigna filed under seal and refers to as the Cigna-MultiPlan Agreement is actually a "Statement of Work" that appears to be one attachment to a larger master services agreement that Cigna decided not to file. *See* Ex. 1

12

to Mot. (filed under seal) at 1. The Court must reject Cigna's request that it consider piecemeal portions of a document ***that was unavailable to Plaintiffs,*** that is incomplete, and that is presented without any other documents that might impact the Court's understanding of that agreement.[3]

The screen shot from Cigna's website is not integral to the FAC either, because the FAC does not quote from it and does not create any inference that Patient Plaintiffs ever saw it. *See* Ex. 5 to Mot., ECF No. 49-7 at 2. In fact, it is unclear whether it even appeared on Cigna's website during the relevant period.

Independently, these documents cannot be considered on this motion because, as documents that obviously do not contain the Plans' terms and cannot modify or supersede Plan terms, they are irrelevant to the Patient Plaintiffs' ERISA claims. *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan,* 555 U.S. 285, 301 (2009) (holding that pursuant to plan document rule an ERISA plan administrator must act in accordance with plan documents, not external documents that "might purport to affect the dispensation of benefits"); *OBG Tech.,* 503 F. Supp. 2d at 498 (court considered extrinsic document only after finding "no material disputed issues of fact" regarding the document's relevance) (quoting *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir. 2006)). 2006)). Any attempt by Cigna to cure these problems for the first time on reply should be rejected.

Cigna's claim that the Cigna-MultiPlan Agreement gives Cigna discretion to ignore the MultiPlan Contracts of the Patient Plaintiffs' providers is irrelevant to Plaintiffs' claims. Even if Cigna otherwise had such discretion that confidential agreement, Cigna is required by its ERISA plans to apply the MultiPlan contracts since they reflect "indirect contracts" with Cigna, thereby

---

[3] For one of the Patient Plaintiffs (Plaintiff Cardona), the Statement of Work expired before Ms. Montoya Marin's surgery even occurred. *Compare* Ex. 1 to Mot., at § 5.0 (filed under seal) to FAC ¶ 78 (surgery occurred on June 8, 2020). *See Plastic Surgery Ctr., P.A. v. Cigna Health and Life Ins. Co.*, CV172055FLWDEA, 2018 WL 2441768, at *6 (D.N.J. May 31, 2018) (declining to consider alleged contractual documents attached to a motion to dismiss where such documents were not in effect when the medical services occurred).

13

making Patient Plaintiffs' providers "Participating Providers" under the Plans. Combined with the alleged facts that Cigna places the MultiPlan logo on its insurance cards and actually applies the MultiPlan rates on many occasions, this means that Cigna cannot rely on any discretion it otherwise may have had in the Cigna-MultiPlan Agreement to ignore the MultiPlan Contracts.

## II. PATIENT PLAINTIFFS PLAUSIBLY ALLEGE THAT CIGNA'S REFUSAL TO PAY THE MULTIPLAN RATE VIOLATED THE TERMS OF THEIR PLANS.

### A. Patient Plaintiffs' Proffered Interpretation of the Plans' Is Reasonable.

Plan documents are "at the center of ERISA." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013); *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 83 (1995) (ERISA's statutory scheme "is built around reliance on the face of written plan documents"). ERISA plan administrators like Cigna must enforce plans according to their terms. *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) ("The administrator's duty" to "focus on the written terms of the plan" is the "linchpin" of ERISA.).

Cigna agrees that the ordinary rules of contract interpretation apply to ERISA plans. Mot. at 11. Under these principles, the Court must review the Plans "'as a whole, giving terms their plain meaning." *Id*. (citing *Fay v. Oxford Health Plan,* 287 F.3d 96, 104 (2d Cir. 2002)). In addition, every provision must be given effect if reasonably possible, since "[p]arties generally do not insert meaningless provisions in their agreements." *Hatcho Corp. v. Della Pietra*, 485 A.2d 1285, 1289 (Conn. 1985); *see also Kuhns Bros. v. Fushi Int'l, Inc.*, No. 3:06CV1917 PCD, 2007 WL 2071622, at *7 (D. Conn. July 16, 2007).

Here, Patient Plaintiffs plausibly allege that the Plan's written terms require Cigna to pay the MultiPlan rates. The Patient Plaintiffs' Plans establish that any provider with a "direct *or indirect*" contract with Cigna is a "Participating Provider." FAC ¶ 2. To illustrate, the most straightforward indirect contract between entities A and C arises when an intermediary, B, "has a

14

'direct' contractual relationship with A," and another entity, C, "has a direct contractual relationship with B." *Cal. Dep't of Toxic Substances Control v. Westside Delivery, LLC*, 888 F.3d 1085, 1092 (9th Cir. 2018) (citation omitted). This perfectly describes the relationship between the Patient Plaintiffs' providers (entity A), who contract with MultiPlan (entity B), which contracts with Cigna (entity C). *See* FAC ¶¶ 3-6. The "indirect contract" term would be meaningless if it was read to exclude this simple relationship, and Cigna does not argue otherwise.[4]

By their plain terms, the Plans treat "Participating Providers" as equivalent to "in-network" providers when calculating the amount of benefits owed. After all, the Plans encourage members to utilize Participating Providers in order to have their Plans "pay[] a greater share of the costs than if you select a non-Participating Provider." FAC ¶ 39. And consistent with that provision, the Plans' Benefit Schedules agree to pay a "greater share of the costs" for "in-network" providers— 80% of covered expenses—compared to only 50% of the "Maximum Reimbursable Charge" ("MRC") for out-of-network providers. *Id.* ¶¶ 34, 37, 75. The Plans also state that the MRC methodology is "not applicable" to in-network providers, since the Plans require paying them their direct or indirect contract rate. *Id.* ¶¶ 35, 64, 75. For non-Participating Providers, the Plans cannot possibly pay a contracted rate: there is no agreement (direct or indirect), so there is no such rate. *See id.* at ¶ 3 ("Only when there is no such contract—*i.e.*, the provider is a non-Participating Provider—do the plans call for a different and lower reimbursement methodology to be utilized"); ¶¶ 36-38, 64, 74-75 (stating covered expenses for non-Participating Providers are determined through the MRC). And there is no Plan term by which any of the MRC methodologies provide for payment at a negotiated rate—direct or indirect. As a result, when Cigna pays the MultiPlan

---

[4] Cigna devotes a single paragraph to the frivolous contention that MultiPlan Providers should not be considered "Participating Providers." Mot. at 13-14 (claiming the Plans' benefit schedule does not refer to Participating Providers). But as explained *infra* at Sec. II.B.2, that argument fails to give meaning to the Participating Provider term.

rate, it necessarily does so under the "in-network" methodology in the Plans' benefits schedules. By conceding that it sometimes pays the MultiPlan rate (as alleged, for example, for Plaintiff Stewart's provider, *see* FAC ¶ 47), Cigna's conduct is consistent with Plaintiffs' interpretation. Moreover, the Plans expressly prohibit Participating Providers from "balance billing," but permit non-Participating Providers to charge the patient for the difference between their bill and the MRC. *Id.* ¶¶ 2, 34, 37. And finally, there is no Plan term that purports to give Cigna the discretion to ignore the definition of a Participating Provider or the language in the benefit schedule, even if doing so might save the Plans money. The Patient Plaintiffs' proposed plan interpretation is reasonable because it gives meaning to the Plans' terms.

**B.    Cigna's Contrary Plan Interpretation Is Unreasonable**

1.    *The Cigna-MultiPlan Agreement and other documents on which Cigna relies are not Plan terms and are irrelevant.*

From the get-go, Cigna unabashedly rests its central argument for dismissing Plaintiffs' ERISA claim, Mot. at 1-2, 11-15—that it has unlimited discretion to refuse to pay the MultiPlan rate if it thinks that rate is too high—on non-plan documents like the secret Cigna-Multiplan Agreement that are outside the FAC. But the "linchpin" of ERISA is the administrator's duty to "focus on the written terms of the plan" *Heimeshoff,* 571 U.S. at 108. The vague website disclaimers, *see* Mot. at 9 & Ex. 5, are not Plan terms, either. Nor are Cigna's generalized policy arguments about the need to reduce medical costs that it unilaterally deems too high. Mot. at 13. It is blackletter ERISA law that neither the Cigna-MultiPlan Agreement, nor anything Cigna puts on its website, nor any policy-based argument it might make during litigation, can alter or supersede the written terms of Plaintiffs' Plans. *See, e.g., Kennedy,* 555 U.S. at 301. *See supra*, Section I. Those are simply assertions that contradict the FAC's factual allegations about Cigna's self-interested actions, and the Court must accept the FAC's allegations as true on this motion. At

16

bottom, Cigna's claim that is has boundless "discretion" to do what it wants is not based on any

Plan language, and Cigna fails to present *any* Plan terms that support it.

> 2. *Cigna's unreasonable Plan interpretation leaves important terms without meaning.*

When Cigna's inadmissible evidence, irrelevant arguments about documents that do not

contain plan terms, and policy-based arguments are set aside, all that remains is an incoherent

interpretation of the Plans' written terms.

Cigna argues that the Plans' reimbursement provisions refer only to in- and out-of-network

providers, while the Plans actually create three categories of providers—in-network, out-of-

network, and "Participating." Mot. at 13-14. But Cigna never bothers to explain—based on Plan

language at least—how in-network providers (a term that is not defined) differ from Participating

Providers. Indeed, under Cigna's interpretation, the Plans provide no reimbursement at all to

Participating Providers because the benefits schedule does not use the term "Participating

Provider." That reading is absurd, particularly since the Plans explicitly encourage the use of

Participating Providers so that the Plans pay more, and patients pay less. And while Cigna admits

it pays the MultiPlan rate sometimes, none of the MRC methodologies for non-Participating

Providers include paying a negotiated (direct or indirect) contractual rate.

Accordingly, contrary to basic principles of contract interpretation, Cigna's reading

renders "Participating Providers" a meaningless term. *See Kuhns Bros.,* 2007 WL 2071622, at *7

(finding the interpretation advanced by defendants unreasonable because it would render one term

in the contract redundant and the other meaningless); *see also U.S. Fid. & Guar. Co. v. S.B. Phillips

Co.*, 359 F. Supp. 2d 189, 200 (D. Conn. 2005) ("the contract must be construed as a whole so that

every provision is given effect, if reasonably possible"). Cigna's interpretation, therefore, is

inherently unreasonable. *O'Shea v. First Manhattan Co. Thrift Plan & Tr.*, 55 F.3d 109, 112 (2d

Cir. 1995) ("Where the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious.") (internal quotation and citation omitted).[5]

> ### 3.   *Cigna's unreasonable interpretation cannot be squared with the fact that it sometimes pays the MultiPlan rate.*

By paying the MultiPlan Contract rate for some covered services—a fact alleged in the FAC and not disputed by Cigna—Cigna recognizes that it does have "indirect contracts" with MultiPlan providers. That is all the Plans' terms require to make them Participating Providers. Cigna's argument—that it has unfettered discretion to ignore those indirect contracts and change the payment methodology for MultiPlan providers whenever it wants—is untethered to any Plan term. And Cigna's unmoored interpretation significantly alters the plan structure chosen by the Plans' sponsors for the benefit of its employees: the Plan sponsors expressly included indirect agreements and third-party rental networks like MultiPlan in the Participating Provider definition, thereby providing access to these extended networks with no balance billing. Cigna cannot reasonably interpret the Plans' terms to eliminate that benefit. The fact that the Cigna-MultiPlan Agreement allegedly gives Cigna the ability not to pay that rate is irrelevant—the Plans' written terms plausibly require it to do so. *Kennedy,* 555 U.S. at 301.[6]

---

[5] Even if Cigna could demonstrate that its Plan interpretation were reasonable (it cannot), dismissal would still be improper, because the Plan's interpretation would then become a question of fact. *See Chapman v. Priceline Grp., Inc.,* No. 3:15-CV-1519(RNC), 2017 WL 4366716, at *4-*5 (D. Conn. Sept. 30, 2017)) (holding that, because both parties raised reasonable interpretations of certain provisions, plaintiff's claims withstood the motion to dismiss); *see also Brunoli v. Fred Brunoli & Sons,* 993 F. Supp. 66, 73 (D. Conn. 1997) (a contract's meaning "becomes an issue for the factfinder" if multiple reasonable interpretations of contractual terms are presented). This is particularly true where, as here, the Patient Plaintiffs allege a host of facts—*e.g.,* Cigna's financial self-interest and misleading EOBs, *see* FAC ¶¶ 46, 69, 81, 85-87—which will need to be assessed in order for the Court to determine how much (if any) deference to give to Cigna's plan interpretation.

[6] Even if the Court could consider the Cigna-MultiPlan Agreement (it cannot), the portion that Cigna submitted supports Plaintiffs' claims. The agreement does not grant Cigna unfettered discretion to deny the MultiPlan rate whenever it chooses. Instead, it recognizes the primacy of the Plans' written terms for making benefits determinations

8524826.1

Cigna's only other argument, that the Patient Plaintiffs' interpretation would result in "absurdities" because it would prevent the payment of contracted rates to non-network providers, is empty hyperbole. *See* Mot. at 15. In theory, of course, plan sponsors ***could*** include plan language that limits the application of "indirect" contract rates to certain circumstances, ***could*** set reimbursement rates for out-of-network services that allow for payment at a contract rate (whether negotiated directly or indirectly), and/or ***could*** give Cigna discretion to determine when to pay such rates. Patient Plaintiffs' point is that any such limit would have to be reasonably discernible from the plans' written terms, but ***that is not the case here***.

Even if the Plans permit Cigna to contract with providers to set negotiated rates on a one-off basis, they indicate that such providers are Participating Providers for those specific services. Indeed, once these providers have a contract with Cigna and Cigna agrees to pay that contracted rate, the Plans' reimbursement schedules treat them as in-network providers for those specific services. That is why ***none of the MRC reimbursement options for non-network providers includes payment at a negotiated contractual rate***. *See supra* at 6-7; FAC ¶¶ 35, 64, 75 (alleging the MRC expressly does not apply to in-network Participating Providers). In exchange, providers with an agreement (whether direct ***or*** indirect) must accept the agreed-upon reimbursement as payment in full and may not balance bill their patients. Cigna's claim that it can pay or not pay the MultiPlan rate whenever it wants is unsupported by any Plan terms, and contravenes many of them.

Finally, even if there were Plan provisions that Cigna could identify as giving it the type of unlimited discretion it claims for itself, Cigna fails to offer any argument how, in light of the fiduciary duties it owes under ERISA, it could legally exercise that discretion to advance its own

---

and requires Cigna to pay the MultiPlan rate or, in the alternative, "pay claims from providers in accordance with the applicable benefit plans." Cigna-MultiPlan Agreement § 1.1.B.7. Where, as here, the applicable benefit plans say nothing about Cigna's discretion to deny the MultiPlan rate where it has a contract that would allow it to pay that rate, it is at least plausible that Cigna is bound to pay it.

8524826.1

interests (generating larger fees for itself) and in a way that harms beneficiaries (exposing them to balance billing), as Plaintiffs have plausibly alleged. FAC ¶¶ 86, 87; *see* 29 U.S.C. § 1104.

## III.   PATIENT PLAINTIFFS PLAUSIBLY ALLEGE BREACH OF FIDUCARY DUTY CLAIMS UNDER 29 U.S.C. § 1132(A)(3)

As plausibly alleged in the FAC, Cigna refuses to pay Multiplan rates in order to elevate its own economic interests over the interests of its plan beneficiaries. Cigna does that by cutting benefits payments as much as possible to maximize the "savings" fees collected from its employer customers and limit benefit payments Cigna has to make for fully insured plans. *See, e.g.*, FAC ¶¶ 8-12, 46, 55, 69, 81, 85-87, 108-109. This violates Cigna's fiduciary duty of loyalty, which requires Cigna to use its discretion "***solely*** in the interest of benefit plan participants and beneficiaries," and for the "***exclusive*** purpose" of providing benefits to plan participants and beneficiaries while defraying reasonable administrative expenses. 29 U.S.C. § 1104(a)(1)(A); *see also Rothstein v. Am. Intl. Group, Inc.,* 837 F.3d 195, 208 (2d Cir. 2016). The Court of Appeals has held that this requires a fiduciary to "act…with an eye single to the interests of the participants and beneficiaries." *State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 136 (2d Cir. 2003) (internal quotation and citation omitted). It also violates Cigna's fiduciary duty of care to act with "care, skill, prudence, and diligence," 29 U.S.C. § 1104(a)(1)(B), and its duty to act "in accordance with" the plan terms, insofar as those terms comply with ERISA itself. *Id.* § 1104(a)(1)(D).

Cigna does not dispute the plausibility of these allegations, but nevertheless contends that Plaintiffs fail to state a claim under § 1132(a)(3). Cigna raises five overlapping and meritless arguments. Mot. at 15-19. The first and second arguments, based on Cigna's frivolous assertion that Patient Plaintiffs have "failed to allege Cigna breached any of their [P]lan terms," are refuted above. *Compare* Mot. at 16 with *supra*, Section II. Cigna's related argument that Patient Plaintiffs only assert that Cigna "owed a fiduciary duty to pay more on their claims," Mot. at 16, misstates

Patient Plaintiffs' allegations. What Patient Plaintiffs actually allege is that Cigna breached its fiduciary duties because it violated the Plan terms in order to pay less in benefits and thereby boost its own profits. FAC ¶¶ 1-15, 85-87; 29 U.S.C. § 1104.

Cigna's third argument rests on a misreading of *Varity Corp. v. Howe*, 516 U.S. 489 (1996). Both the Federal Rules of Civil Procedure and ERISA allow for pleading in the alternative. *See* Fed. R. Civ. P. 8(d). Counts II and III of the FAC seek relief under 29 U.S.C. § 1132(a)(A) and (B) only in the alternative, "to the extent that the Court finds that the injunctive relief sought is unavailable" under 29 U.S.C. § 1132(a)(1)(B). FAC ¶¶ 111, 113. By definition, they are non-duplicative of Count I. Unlike (a)(1)(B), Section 502(a)(3)(A) explicitly permits an action "to enjoin any act or practice which violates [ERISA] or the terms of the plan," while § 502(a)(3)(B) provides for "other appropriate equitable relief" to redress a violation of ERISA or plan term, or to enforce any provision of ERISA or plan term. 29 U.S.C. § 1132(a)(3). That is precisely what the Patient Plaintiffs seek here.

Cigna devotes the entire first section of its motion to insisting that Patient Plaintiffs have no § 502(a)(1)(B) claim. Yet, Cigna wants to dismiss the § 502(a)(3) counts on the grounds that Patient Plaintiffs' § 502(a)(1)(B) claim can fully remedy their injuries. Mot. at 17. Cigna's argument is intended to leave Plaintiffs with no claims at all. *See Varity Corp.*, 516 U.S. at 489 (when Plaintiffs cannot obtain relief under the first and second subsections of ERISA, § 502(a), they must "rely on the third subsection," or, impermissibly, be left "with no remedy at all.").

In any event, Second Circuit precedent firmly holds that a plaintiff may proceed with both (a)(1) and (a)(3) claims at the pleading stage. *See Devlin v. Empire Blue Cross & Blue Shield,* 274 F.3d 76, 89 (2d Cir. 2001) ("[S]hould plaintiffs' claim under ERISA § 502(a)(1)(B) [] to enforce their rights under the plan fail, plaintiffs' breach of fiduciary duty claim is their only remaining

21

remedy. *Varity Corp.* clearly provides that, where a plan participant has no remedy under another section of ERISA, she can assert a claim for breach of fiduciary duty under § 502(a)(3).”). *Varity Corp.* “did not eliminate a private *cause of action* for breach of fiduciary duty when another potential remedy is available.” *N.Y. State Psychiatric Ass'n, Inc., v. UnitedHealth Group*, 798 F.3d 125, 134 (2d Cir. 2015) (quoting *Devlin*, 274 F.3d at 89) (emphasis in original). Nothing prevents a plaintiff from pleading both (a)(1) and (a)(3) claims, because at the pleading stage “it is not clear . . . that monetary benefits under § 502(a)(1)(B) will provide [Plaintiffs] a sufficient remedy.” *N. Y. State Psychiatric Ass'n*, 798 F.3d at 134. Of course, Plaintiffs may not obtain duplicative recovery from both claims, but they have not asked for it here.

Moreover, Patient Plaintiffs request equitable relief, including equitable disgorgement of ill-gotten gains, a surcharge, and an order from this Court compelling Cigna to reasonably interpret Plan terms in accordance with its fiduciary duties.[7] *See* FAC at 31 ¶ C (asking the Court to “permanently enjoin[] Cigna from engaging in the misconduct described herein); *id*. ¶ E (requesting an appropriate equitable surcharge “as necessary to make Class Members whole”). This disposes of Cigna's fifth argument. Such forms of equitable and injunctive relief are precisely what § 1132(a)(3) authorizes and are not a “dressed up legal remedy.” Mot. at 18.

Cigna's final argument—that its conduct could not be a fiduciary breach because, even if it cannot point to any Plan terms that support its actions, those actions were intended to preserve

---

[7] *Lines v. Hartford Fin. Servs. Grp. Inc.*, 3:21-CV-00029 (KAD), 2022 WL 408820, at *7 (D. Conn. Feb. 10, 2022), is inapposite because it was premised on the decedent's lack of coverage at the time of his death in light of his failure to submit a required form. There, the court dismissed the plaintiff's § 502(a)(3) claim because he sought “benefits allegedly due under the policy at issue rather than equitable relief.” *Id*. By contrast, Plaintiffs challenge not only Cigna's denial of their claims, but also Cigna's conduct, including unreasonably interpreting and applying the Plans in ways that harmed the interests of Plan beneficiaries, all to promote its own economic self-interest. Cigna's citation to two summary judgment decisions, *Noecker v. S. Cal. Lumber Indus. Welfare Fund*, 2011 WL 13147419 (C.D. Cal. Feb. 25, 2011),25, 2011), and *Minerley v. Aetna*, 2019 WL 2635991 (D.N.J. June 27, 2019),), is similarly misplaced. In *Minerley*, the plaintiff challenged the enforcement of a plan term, whereas here, Plaintiffs claim Cigna acted in contravention of Plan terms to maximize its own profits. The *Noecker* court made factual findings about the challenged conduct, which this Court cannot do at the pleading stage.

8524826.1

Plan assets—is as disingenuous as it is unconvincing. *See* Mot. at 17-18. First, because Patient Plaintiffs allege that Cigna was motivated by economic self-interest, Cigna's self-serving statement of its intentions is irrelevant at this point. This argument is predicated on the conclusory assertion that providers indirectly contracting with Cigna through MultiPlan are out-of-network providers. Mot. at 17. In fact, as Plaintiffs' have plausibly alleged, the terms of the Plans show that the Plans' sponsors chose a plan structure intended to give their employees access to a greater number of providers while protecting them from the risk of balance billing. *See* Sec. II.B.3, *supra* (showing that the Plans define providers with "indirect" contractual arrangements as Participating Providers, and include a reimbursement approach that pays those providers their agreed-upon contractual rates). At most, Cigna creates a factual dispute about what the Plans actually say, and what they actually mean—and at this stage, it must be resolved in Plaintiffs' favor.

Cigna's reliance on *Roganti v. Metro. Life Ins. Co.,* 786 F.3d 201 (2d Cir. 2015), is also misplaced. In a post-trial appeal, that court addressed an administrator's discretion to weigh evidence submitted in connection with a benefit claim. *Id*. at 211-212. The question was whether the defendant plan administrator had sufficient evidence to deny the claim. *Id*. at 212. The Court of Appeals explained that a plan administrator must balance the "obligation to guard the assets of the trust from improper claims [and] the obligation to pay legitimate claims." *Id*. By contrast, Patient Plaintiffs' ERISA claims do not concern the weighing of evidence; rather Plaintiffs allege that Cigna unreasonably disregarded applicable written terms of the Plans, acted contrary to the interests of the beneficiaries whose claims were at issue, and did so for self-serving purposes. *Roganti* in fact eviscerates Cigna's argument by distinguishing between "improper" claims (*i.e.*, those not covered by a reasonable interpretation of the plan) and "legitimate" claims (those reasonably supported by plan terms). Nothing in *Roganti* suggests that fiduciary administrators

have the power to unreasonably interpret plan terms and reduce the amount of benefits owed in a way that ***conflicts*** with the approach required by the plan, even if they do so (or at least say they do so) to preserve plan assets. Unlike in *Roganti*, Plaintiffs allege that Cigna's decisions contradict their Plans' terms and were motivated by Cigna's desire to increase its profits. FAC ¶¶ 85-87. ERISA requires exactly the opposite. 29 U.S.C. § 1104. In other words, Cigna's duty is to ensure that the participants and beneficiaries receive the benefits to which they are entitled under the terms of their ERISA plans, ***not*** to save the plans money by underpaying claims (while increasing Cigna's own fees). Cigna's radical re-write of ERISA's fiduciary duties would render written plan terms—the center of the ERISA universe—largely irrelevant. *See US Airways*, 569 U.S. at 101.

## IV.    ASSOCIATION PLAINTIFFS PLAUSIBLY ALLEGE THEIR STATE LAW CLAIMS

The FAC alleges that Cigna not only violated the ERISA duties it owed the Patient Plaintiffs, but also independently violated state law duties owed to members of the Association Plaintiffs like the Patient Plaintiffs' providers. As a result, these associations assert four claims on behalf of their physician-members: negligent misrepresentation (Count IV), tortious interference (Count V), promissory estoppel (Count VI), and a violation of the Washington Consumer Protection Act (Count VII). While the FAC extensively details allegations relevant to these claims, three sets of well-pleaded facts are at the heart of all of them:

First, Association Plaintiffs allege that Cigna places the MultiPlan logo on the insurance cards of Cigna members, knowing that providers "routinely request, copy, and examine" such cards prior to treating patients. FAC ¶¶ 15, 92. Each of the Patient Plaintiffs' providers did so here. *Id*. ¶¶ 41, 66, 77. The placement of the logo communicates Cigna's acceptance of MultiPlan Contracts to providers (and their patients). *Id.* ¶ 6. As alleged, the Patient Plaintiffs' providers understood the logo to mean that Plaintiffs' Plans had agreed to accept and apply the providers'

MultiPlan rates. *Id*. ¶¶ 42, 66, 77. But without justification, Cigna refused to reimburse the providers at their agreed-upon MultiPlan rates. *Id*. ¶¶ 15, 44, 49, 55-56, 60, 68-69, 71, 79-81, 87.

Second, Association Plaintiffs allege that Cigna actually paid the MultiPlan rate on numerous occasions when providers with MultiPlan Contracts submitted claims after treating a patient whose Cigna insurance card contained the MultiPlan logo. *Id*. ¶¶ 7, 47. And Cigna effectively concedes that it pays the MultiPlan rates for some claims. *See* Mot. at 13 (attempting to justify the circumstances when Cigna rejects the MultiPlan Contracts).

Third, Association Plaintiffs allege that Cigna sent its Plan members EOBs stating that their providers had agreed to accept a heavily discounted amount as payment in full, and not to balance bill. *Id*. ¶¶ 15, 93, 95, 126-27. Those statements were false: the only negotiated rate the providers had accepted was with MultiPlan. *Id*. ¶¶ 46, 50, 51, 69, 81. Cigna knew that once it disregarded the MultiPlan Contracts and refused to pay the MultiPlan rate, it exposed patients to balance billing, but did so anyway to earn itself additional fees. *Id*. ¶¶ 15, 49, 126.

These allegations, taken together with the reasonable inferences they create, easily establish that the Association Plaintiffs have standing and that their state law claims are plausible.

### A.     The Association Plaintiffs Have Standing

Associational standing allows an organization to "bring suit on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit.'" *N.Y. State Psychiatric Ass'n, Inc.*, 798 F.3d at 130 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). This test only requires "an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of

claim) pleaded by the association." *United Food and Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). Association Plaintiffs easily clear this modest bar.

          1.    *Association Plaintiffs plausibly allege the threat of future harm*

Cigna's argument that the Association Plaintiffs have not plausibly alleged a threat of future harm (other than for their tortious interference and WCPA claims) because Cigna has "left no doubt" that it will not "always" pay the MultiPlan rates, Mot. at 22, is pure sophistry. It is akin to arguing that the victim of pollution has no threat of future harm because the polluter has stated that it intends to continue to pollute, albeit on an unpredictable schedule.

"[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The Association Plaintiffs plausibly allege that Cigna's refusal to honor their MultiPlan Contracts creates uncertainty now and in the future about how much the providers will be reimbursed and whether they can balance bill. These factors plausibly impact the providers' willingness to treat Cigna-insured patients—not just new ones, but also existing patients who are likely to seek additional care. Further, Cigna never explained its decision to ignore the MultiPlan Contracts throughout the lengthy appeals process. *See e.g.*, FAC ¶¶ 48, 71. In fact, Cigna acknowledges that its conduct creates uncertainty about how a claim will be handled in the future. Mot. at 21-22 (emphasizing that it will not "always apply [the providers'] MultiPlan rates when they treat Cigna plan members in the future"). Such uncertainty harms providers by undermining their ability to manage their business and interferes with their patient relationships, including by calling into question how much they are owed and by whom (plan or patient). *See Fairfield County Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 271-72 (D. Conn. 2013), *aff'd as modified sub nom.*, 557 Fed. App'x. 53 (2d Cir. 2014) (holding that members of a medical association had established irreparable harm from an

insurer's actions which disrupted physician-patient relationships and harmed their business); *Humana Ins. Co. v. Tenet Health System*, 1:16-CV-1450 AWI SAB, 2016 WL 5815907, at *3 (E.D. Cal. Oct. 4, 2016) (finding irreparable harm because plaintiff providers established "significant uncertainty as to [their patients'] medical coverage"). Coupled with the allegation that Cigna's misconduct is widespread and ongoing, FAC ¶¶ 15, 93, 95, 99, the Association Plaintiffs plausibly plead the threat of future injury.

2.     *Association Plaintiffs' claims do not require individual participation.*

Cigna's argument that Association Plaintiffs' state law claims require extensive individual testimony is equally unavailing. Mot. at 23-27. Cigna's cases are inapposite because they involve plaintiffs seeking monetary damages, while Association Plaintiffs request only injunctive and declaratory relief. FAC ¶ 15. *See, e.g.*, *Bondholder Comm. on Behalf of Owners of Quad Cities Reg'l Econ. Dev. Auth. First Mortg. Revenue Bonds Series 2013A v. Sauk Valley Student Hous., LLC*, Civil Action No. 17-7337 (MAS) (LHG), 2019 WL 1864121, at *3 (D.N.J. Apr. 24, 2019) (stating that plaintiffs asked for "monetary damages on behalf of individual Bondholders due to alleged fraud" and finding no associational standing because damages claims generally require individual participation); *Westfield Park Homeowners' Ass'n, Inc. v. NVR, Inc.*, No. 1:06 CV 00507, 2007 WL 9774486, at *1 (N.D. Ohio Mar. 27, 2007) ("plaintiff . . . seeks to recover monetary damages from [defendant]").

An association has standing when it challenges allegedly "systemic policies and practices" and seeks "only injunctive or declaratory relief." *N.Y. State Psychiatric Ass'n, Inc.*, 798 F.3d at 131. Other Circuits agree: in *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, for instance, the Third Circuit found that a medical association's breach of contract, tortious interference, and fraudulent misrepresentation claims withstood a motion to dismiss because they "involve[d] systemic policy violations that will make extensive individual participation

unnecessary." 280 F.3d 278, 282, 286 (3d Cir. 2002).[8] Because all of Association Plaintiffs' claims challenge Cigna's systemic false and misleading statements, they can prove their claims with limited individual participation. *N.Y. State Psychiatric Ass'n, Inc.*, 798 F.3d at 131; FAC ¶¶ 92-95 (explaining that Cigna uses misrepresentations to patients to "pressure providers to agree" to heavily discounted rates, "in order to maximize [Cigna's] profits through exorbitant and unreasonable 'savings fees'").

Proving these claims does not require the participation of every member of the Association Plaintiffs, however: it requires, at most, a few examples like those found in the FAC. *See New Jersey Physicians v. President of the U.S.*, 653 F.3d 234, 241 (3d Cir. 2011) ("In order to establish associational standing, however, an organization must 'make specific allegations establishing that at least one identified member ha[s] suffered or would suffer harm.'") (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)); *Pennsylvania Psychiatric Soc.*, 280 F.3d at 283 (holding that "[t]he need for some individual participation . . . does not necessarily bar associational standing under [*Hunt's*] third criterion"); *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1308 (S.D. Fl. 2003) ("It is well-established that an association may seek equitable relief on behalf of its members without running afoul of the third prong of the *Hunt* test."). At any rate, Association Plaintiffs have alleged that there are many others. FAC ¶¶ 16-19 (alleging that the Association Plaintiffs assert claims on behalf of their members "who practice and resides in all states").

The conduct underlying the Association Plaintiffs' claims violates the laws of all states. Even if the elements of the torts alleged in Counts IV–VI varied materially among the states (Cigna has not established that they are), that simply means that Association Plaintiffs will need to prove

---

[8] *See also Borrero v. United Healthcare of NY, Inc.*, 610 F.3d 1296, 1306 (11th Cir. 2010)2010) (holding that representative associations had standing because their claims could "be proved with the limited participation" of members because they challenged the insurer's practices and sought "an alteration of United's methodology, not redress for any specific past decision.").

all such elements to obtain nationwide relief, or that at the end of the case, the Court may restrict the scope of any injunctive relief ordered to the applicable states. As the FAC plausibly establishes associational standing because each of the Association Plaintiffs has at least one member with individual standing (*i.e.*, Drs. Schwaegler and Cooperman), Cigna's arguments are premature.

Cigna's final speculation—that some members of the Association Plaintiffs may not want the requested injunctive relief, Mot. at 26-27—at most raises a factual issue that must be resolved against Cigna. But the only reasonable inference to be drawn from the FAC is that MultiPlan rates are higher than the rates Cigna otherwise pays, and that providers want their Multiplan Contracts to be honored. Indeed, even if Cigna's assertion about what providers want had some support in the FAC (it does not), it would still not defeat standing. *See Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 865 (7th Cir. 1996) (where, as here, "the litigation was properly authorized in accordance with the association's procedures" the court may be assured that "the membership has affirmed that the detriment to some members' interests does not render the litigation outside the germane interests of association" and "that the association will pursue the litigation with the strong advocacy and persistence necessary to be an effective representative.").

**B.    Association Plaintiffs Plausibly Allege That Cigna Is Liable for Negligent Misrepresentation.**

1.    *Cigna's placement of the MultiPlan logo plausibly communicates to MultiPlan providers that Cigna honors their MultiPlan Contracts.*

Cigna's attempt to dismiss Association Plaintiffs' negligent misrepresentation claim rests on a mischaracterization.[9] The factual allegations described above, *see supra* Section IV, make

---

[9] Under New Jersey law, a negligent misrepresentation is "'[a]n incorrect statement, negligently made and justifiably relied on, [and] may be the basis for recovery of damages for economic loss . . . sustained as a consequence of that reliance.'" *Singer v. Beach Trading Co.*, 876 A.2d 885, 890–91 (N.J. Super. App. Div. 2005) (citations omitted). Similarly, under Washington law a plaintiff must plead "that (1) the defendant supplied information that was false for the guidance of the plaintiff in a business transaction, (2) the defendant knew or should have known that the information was for the purpose of guiding the plaintiff in a business transaction, (3) the defendant was negligent in

Association Plaintiffs' negligent misrepresentation claim plausible: by putting the logo on the card—a communication plausibly intended to induce MultiPlan providers to treat Cigna plan members—and paying the MultiPlan rate for various services, Cigna unreasonably misrepresented to MultiPlan providers that it would honor their MultiPlan Contracts, when in fact it rejects those Contracts whenever it wants to maximize its own profits and then lies to patients and their providers about who owes what. FAC ¶¶ 7, 43-47, 69, 81, 85-87, 114-121.

Cigna relies heavily on *Plastic Surgery Ctr.*, 2018 WL 2441768, at *7, but that decision addressed far more limited allegations than those here. In that case, the court did not cite any allegations about Cigna's practice of paying claims at MultiPlan rates, allegations that support Association Plaintiffs' claims about the nature of the misrepresentation. Moreover, *Plastic Surgery*'s conclusion that the placement of the MultiPlan logo did not plausibly communicate that Cigna would reimburse a MultiPlan provider at her MultiPlan rate was devoid of any explanation. Indeed, the tepid statement that the MultiPlan logo "***may*** indicate ***some*** relationship between Multiplan and Cigna," *id.* (emphasis added), essentially says the logo has no meaning at all. However, given the limited space on a patient insurance card—a card that Cigna knows providers examine and rely upon—it is more implausible that Cigna would choose to include the MultiPlan logo, intending it to communicate nothing of value to providers with MultiPlan Contracts.

In fact, the FAC's allegations make it plausible that providers with MultiPlan Contracts— who see a MultiPlan logo on members' insurance cards, who know that they (the providers) have MultiPlan Contracts that contain an agreed-upon rate, and who know that Cigna has previously paid their MultiPlan rate for their services—would conclude from seeing the logo that if they

---

obtaining or communicating the false information, (4) the plaintiff relied on the information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages." *Dewar v. Smith*, 342 P.3d 328, 336 (Wash. App. Div. 1 2015) (citation omitted).

8524826.1

provide covered services, they will be reimbursed at their MultiPlan Contract rates.[10] The FAC does not allege (and Cigna does not claim) that providers have ever seen or agreed to any terms of the confidential Cigna-MultiPlan Agreement. The Association Plaintiffs respectfully submit that, in such circumstances, the most reasonable inference for a MultiPlan provider to make upon seeing the MultiPlan logo is that Cigna honors their MultiPlan Contract and pays their MultiPlan rate. It is similarly plausible that the physicians interpreted Cigna's placement of the MultiPlan logo to mean that Cigna would apply ***the only existing agreement they had ever seen***—their indirect contract with MultiPlan.  It is reasonable to infer that Cigna knew or should have known this. And, given Plaintiffs' allegation that Cigna was motivated by a self-interested desire to maximize profits, it is reasonable to infer that Cigna's false representations to the providers were, at minimum, negligent. *Id*. ¶¶ 11-12, 95.

2.      *Cigna's other arguments about Count IV also fail.*

Cigna presents a grab-bag of other arguments about the negligent misrepresentation claim. None has merit. <u>First</u>, Cigna's attempt to reframe its misrepresentations as statements of ***future*** conduct is a semantic mischaracterization that fails as a matter of law. As alleged, the misrepresentation does concern an "existing fact." The logo communicates to physicians—at the time they review it before treating prospective patients—that Cigna ***currently*** has an arrangement with MultiPlan, and pursuant to that agreement agrees to reimburse at the MultiPlan rate.

Contrary to Cigna's contention, the protection for statements as to "future or contingent events," applies only where the communication is between parties who have equal means of

---

[10] Notably, Cigna—which offers its own spin on many factual issues in the FAC—offers no plausible explanation for what the MultiPlan logo *does* communicate to providers, if not recognition of their MultiPlan Contracts. Of course, any such explanation would be irrelevant at the pleading stage. But Cigna simply adopts the unexplained conclusion from *Plastic Surgery Center* without accounting for the types of allegations in this case that were not considered by that court.

knowledge, is not made with intent to deceive, or where the subject of the communication can be equally investigated by both sides. *Chatlos Sys., Inc. v. Natl. Cash Register Corp.*, 479 F. Supp. 738, 748 (D.N.J. 1979), *aff'd in part, remanded in part on other grounds,* 635 F.2d 1081 (3d Cir. 1980). Similarly, promises which "the promisor had no intention of keeping" fall outside this category. *Stolba v. Wells Fargo & Co.*, 10-CV-6014 WJM MF, 2011 WL 3444078, at *4 (D.N.J. Aug. 8, 2011). Here, the physicians viewing a Cigna member's insurance card do ***not*** have an equal chance to ascertain the meaning of the MultiPlan logo, because they do not have access to the secret Cigna-MultiPlan Agreement or knowledge about Cigna's self-serving plans to disregard the MultiPlan Contracts. Finally, this is not a case where Cigna allegedly makes "overly optimistic" promises, or where it failed to account for some future contingency; this involves a promise to pay a specific discounted rate that the providers agree to accept when signing their MultiPlan Contracts, and Cigna's refusal to pay that rate.[11] *See Chatlos Sys.*, 479 F. Supp. at 749.

    Second, and as discussed *supra*, Cigna's claim about what it knew or should have known it was communicating to doctors through the MultiPlan logo, Mot. at 31, at most raises a factual dispute. Cigna's rests on two agreements—the secret Cigna-MultiPlan Agreement, and the MultiPlan Contracts. As to the former, it is both plausible and reasonable to infer that Cigna knew that physicians with MultiPlan Contracts did not agree to, or have access to, the terms of the secret Cigna-MultiPlan Agreement. As to the latter, Cigna makes bald statements about the contents of the physicians' MultiPlan Contracts. *See* Mot. at 31. But Cigna has not put the providers'

---

[11] Further, the cases Cigna cites in support of this argument are inapposite: *Plastic Surgery Ctr.*, 2018 WL 2441768, and *Atl. Neurosurgical,* 2022 WL 158658, did not analyze whether the statements at issue in those cases related to present or future conditions. In fact, *Atl. Neurosurgical v. MultiPlan, Inc.,* 20-Civ. 10685 (LLS), 2022 WL 158658 (S.D.N.Y. Jan. 18, 2022), did not discuss the temporal aspect of the representation at all. *Plastic Surgery Ctr.* only recited the general rule that representations must involve "statement[s] of past or existing fact," and dismissed the claim on other grounds after it found the MultiPlan logo *alone* did not establish a promise to pay a specific rate. But that falls far short of Plaintiffs' allegations in this case. *Id.* at *7.

8524826.1

MultiPlan Contracts before the Court and Cigna's statements about them are not reasonably drawn from the FAC.[12] The Court cannot credit Cigna's assertion that any of those contracts (let alone all of them) are the same as the agreement at issue in *L.I. Minimally Invasive v. MultiPlan*, Index No. 605520/2016, Dkt. 187 at 11 (NY Sup. Ct. Nassau Cnty. Apr. 24, 2020). That is not the most reasonable inference to be drawn from the FAC.

Third, Cigna's claim that Plaintiffs have not pled justifiable reliance simply ignores the facts alleged in the FAC. Plaintiffs are entitled to the reasonable inference that the only reason Cigna includes the MultiPlan logo on its insurance cards is to inform cardholders and providers that Cigna has a contractual relationship (directly or indirectly) with the providers in the network. And, as Plaintiffs allege, the ***only*** contractual agreement that MultiPlan providers know about is the one that sets a payment rate for their services, and Cigna pays that rate at times. Thus, the providers' assumption that the logo communicated acceptance of their MultiPlan Contract is both plausible and reasonable. FAC ¶¶ 41, 66, 77.[13]

Fourth, the economic loss doctrine is inapplicable. Association Plaintiffs cannot bring contract claims against Cigna: they have no direct contract with Cigna, and the economic loss doctrine is irrelevant where no contract exists between the parties. *See SRC Const. Corp. of Monroe v. A. City Hous. Auth.*, 935 F. Supp. 2d 796, 799 (D.N.J. 2013) (applying New Jersey law and concluding that the economic loss doctrine "only applies to bar certain tort claims *between parties to a contract*" and that "the absence of a contract between a plaintiff and defendant in a negligence

---

[12] Cigna cannot attempt to fix this problem for the first time on reply either.

[13] Cigna's attempt to invoke "publicly available information" on its website to prove the providers could not have reasonably relied on the MultiPlan logo is similarly unavailing. Mot. at 3. Like the secret Cigna-MultiPlan agreement, this patient-directed website is material extraneous to the FAC and the Court cannot consider it at this stage. At most, it raises a factual dispute that must be resolved in the Association Plaintiffs' favor. In addition, Cigna ignores Plaintiffs' allegation that Cigna's representations communicate that it *has* agreed to apply the MultiPlan Contracts. FAC ¶¶ 41, 66, 77.

8524826.1

suit precludes the application of the economic loss doctrine") (emphasis in original); *Reynolds Metals Co. v. Alcan Inc.*, C04-0175RJB, 2006 WL 1169790, at \*5 (W.D. Wash. May 1, 2006) (applying Washington law and explaining that "the economic loss rule only bars tort claims where the parties had a contractual relationship").

That is why all of Cigna's cases are inapposite. They all involve plaintiffs who had direct contractual rights and sought monetary damages from the defendant. *E.g.*, *Plastic Surgery Ctr.*, 2018 WL 2441768 at \*4–\*6. Cigna admits that the economic loss doctrine only "prohibits tort claims where the alleged injury flowed from a contract and can be remedied with monetary damages." Mot. at 32-33 (citing *Plastic Surgery,* 2018 WL 2441768, at \*7–\*8; *Alejandre v. Bull,* 159 Wash. 2d 674, 683 (Wash. 2007)). But here, neither prerequisite is met. Association Plaintiff

## C.    Association Plaintiffs State a Claim for Tortious Interference.

Association Plaintiffs plausibly allege tortious interference. FAC ¶¶ 122-128. Cigna argues to the contrary, but ignores the allegations at the heart of the claim—Cigna's false statements on EOBs, *see id.* ¶¶ 15, 95, 126, 128. It also creates factual disputes that cannot be resolved on this motion and presents a misleading summary of the law.[14]

In addition to the facts described *supra*, the FAC extensively pleads facts describing the relationship between patients and their physicians, which support the reasonable inference that an

---

[14] To plead tortious interference with a business expectancy or economic relationship under New Jersey law, a plaintiff must allege facts showing (1) "some protectable right—a prospective economic or contractual relationship;" (2) "interference . . . done intentionally and with 'malice;'" (3) the interference caused the loss of the prospective gain;" and (4) "the injury caused damage." *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989). The elements of a tortious interference with an existing contract claim are identical, except that plaintiffs must plead the loss of an existing contractual relationship rather than a business expectancy. *See Fid. Eatontown, LLC v. Excellency Enter., LLC*, 3:16-CV-3899-BRM-LHG, 2017 WL 2691417, at \*6 (D.N.J. June 22, 2017).

The equivalent tort in Washington requires pleading: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Pleas v. City of Seattle*, 774 P.2d 1158, 1161 (Wash. 1989). Notably, "[i]ll will, spite, defamation, fraud, force, or coercion, on the part of the interferor, are not essential ingredients…."*Id.*

8524826.1

economic relationship or contractual agreement existed between them. *See* FAC ¶¶ 40-43, 65-67, 77-78. Paragraphs 123 and 124 of the FAC state plainly: "The providers each entered into a valid contract or had a reasonable economic expectancy when they agreed to provide medical services to Cigna members, based on the expectation that they would receive a reasonable reimbursement for their services. Cigna knew and understood that providers agreeing to offer health care services to Cigna members had entered into such contracts or had a reasonable economic expectancy."

Plaintiffs also plausibly allege that Cigna's conduct was wrongful, indicating that the interference was intentional. In both Washington and New Jersey, "wrongful means" are enough to show intentional interference, even if the defendant did not subjectively intend to harm. *See Pleas v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989) (prohibiting "wrongful means that in fact cause injury to plaintiff's contractual or business relationships"); *Nostrame v. Santiago*, 61 A.3d 893, 902 (N.J. 2013) (explaining that misrepresentations and/or violations of the law are among the kinds of conduct that would be considered to be "wrongful means'") (citation omitted). Likewise, §766B of the Second Restatement of Torts—used by courts in both jurisdictions for guidance on this element—identifies multiple factors to consider in determining whether the defendant's interference was improper, including motive, the relationship and interests of the parties, societal interests, and the proximity of the defendant to the interference. Restatement (Second) of Torts § 767 cmt. d. (1979). The allegations in the FAC and the reasonable inferences arising from them plausibly suggest that each of these factors is present. For example, Association Plaintiffs allege that Cigna was improperly motivated by its own economic interests to reject the MultiPlan Contracts, minimize the amount it pays to providers, and make false representations in its EOBs. FAC ¶¶ 85-88, 126, 127.

Cigna wrongly states that the tortious interference claim rests on Cigna's failure to honor the MultiPlan Contracts, and addresses Association Plaintiffs' main allegations supporting that claim—concerning the misstatements on EOBs—only in passing. Mot. at 35. Cigna posits that the EOBs are not deceptive because they "correctly" state that Cigna uses "other means" (rather than the MultiPlan rate) to adjudicate providers' claims. *Id.* At this stage, however, the Court must reject Cigna's alternate view of the facts. The FAC plainly alleges that Cigna's conduct is improper because the EOBs deceptively suggested that the providers accepted those other, lower rates and agreed not to balance bill, when they had not. *See* FAC ¶¶ 15, 44-46, 68, 69, 80, 81, 95, 126, 128.

As a last resort, Cigna contends that the physicians did not suffer injury. Mot. at 33-34. But as alleged, Cigna's misrepresentations, such as the misleading EOBs, plausibly interfere with the physicians' relationships with their patients and harms their ability to get paid what they expect. Indeed, Cigna affirmatively told the patients that balance billing would be improper when it was, in fact, entirely appropriate. This is more than sufficient injury. In *New Jersey Psychol. Ass'n v. MCC Behavioral Care, Inc.*, 96-CV-3080, 1997 WL 33446538, at *5 (D.N.J. Sept. 17, 1997), for example, the court declined to dismiss a medical association's tortious interference claim because the plaintiff "sufficiently alleged that the psychologist-patient relationship was disrupted in a manner which would have serious economic consequences on their practices." *See also Fairfield County Med. Ass'n*, 985 F. Supp. 2d at 271-72. That is the case here. Cigna's EOB misrepresentations interfere with the patient-physician relationship in ways that make it much harder for the provider to collect the balance of the bill from the patient, since Cigna falsely informs patients that they owe nothing further.

8524826.1

D.      **The FAC states a claim under the WCPA.**

Association Plaintiffs' allegations also plausibly state a claim against Cigna under the WCPA.[15] Cigna challenges only whether the alleged unfair and deceptive conduct affects a "substantial portion of the public," and whether it impacts the public interest. Mot. at 37-38. This is easily satisfied by the FAC's allegations. Cigna caused substantial injury to patients and providers across the State of Washington by misleading patients on its EOBs about non-existent discounts accepted by their providers and their responsibility for unpaid charges. FAC ¶ 139.

The "public interest" element of a WCPA claim may also be established "by showing a violation of a statute that '***contains a specific legislative declaration of public interest impact***.'" *Kosovan v. Omni Ins. Co.,* 496 P.3d 347, 367 (Wash. App. Div. 2 2021) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778) (1986)(emphasis added). Statements of the Washington legislature directly refute Cigna's claim that its alleged misconduct does not impact the public interest. *See Kosovan,* 496 P.3d at 357 ("Insurers owe a statutory duty…to exercise good faith when processing an insured's claim."). In the section of the Washington Code concerning insurance—including health insurance—the legislature stated, in a provision titled "Public Interest," that:

> The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance.

Wash. Rev. Code Ann. § 48.01.030. "[V]iolation of RCW 48.01.030, therefore, implicates the public interest…." *Kosovan*, 496 P.3d at 366; *see also Schiff v. Liberty Mut. Fire Ins. Co.*, 82554-

---

[15] To establish a WCPA violation, a plaintiff must show "(1) an unfair or deceptive practice; (2) occurring in trade or commerce; (3) affecting the public interest; (4) that injures the plaintiff in his or her business or property; and (5) a causal link between the unfair or deceptive act and the injury suffered." *Nat'l Products, Inc. v. Arkon Resources, Inc.*, 294 F. Supp. 3d 1042, 1049 (W.D. Wash. 2018), *aff'd*, 773 Fed. App'x. 377 (9th Cir. 2019) (citation omitted).

8524826.1

2-I, 2022 WL 17246820, at *1 (Wash. App. Div. 1 Nov. 28, 2022) (granting summary judgment in favor of provider who challenged insurer's unfair reimbursement scheme under the WCPA).

This case is substantially different from *Kelley-Ross & Assocs., Inc. v. Express Scripts, Inc.,* 2022 WL 1908917, at *6 (W.D. Wash. June 3, 2022), which did not include allegations like those made here: that the defendant made false statements to patients knowing that doing so would pressure providers to accept lower reimbursement rates. FAC ¶ 95. In a similar vein, "[a]n insurer that breaches its duty as set forth in RCW 48.01.030 has engaged in a per se unfair or deceptive trade practice in violation of the CPA, thus establishing the first two elements of a CPA claim." *Kosovan*, 496 P.3d at 358. Additionally, Cigna's statement that its "conduct is directed to the Associations' healthcare provider members, not the public," Mot. at 37, is inconsistent with the FAC. It alleges that Cigna sent deceptive communications directly to patients through its EOBs. FAC ¶ 139. In short, Cigna has failed to address the actual unfair conduct alleged here and should not be allowed to do so for the first time in reply.[16]

## E.     The FAC Adequately Pleads a Claim for Promissory Estoppel.

Finally, Association Plaintiffs' claim for promissory estoppel (Count VI) is also plausibly alleged.[17] Cigna challenges only two elements of this claim: whether there are sufficient allegations of a promise, and whether reliance on the alleged promise was reasonable. Mot at 35-36. Both are plausibly pled.

---

[16] Cigna's passing reference to pre-emption (Mot. at 38) is meritless. *See CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165 (3d Cir. 2014) (holding that providers may assert state law claims even where factually related to patients' ERISA claims).

[17] The elements of a promissory estoppel claim under Washington law are: "(1) A promise which (2) the promisor should reasonably expect to cause the promise to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise." *Corey v. Pierce County*, 225 P.3d 367, 376 (Wash. App. Div. 1 2010) (quoting *Corbit v. J.I. Case Co.*, 424 P.2d 290 (Wash. 1967)). New Jersey law is similar: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (citation omitted).

Relying on increasingly outdated precedent, Cigna argues that its promises were not sufficiently "clear and definite" to give rise to promissory estoppel. In more recent decisions, New Jersey courts have eschewed the rigid analysis in the 1978 case on which Cigna relies, *Malaker Corp. S'holders Protective Comm. v. First Jersey Nat'l Bank,* 163 N.J. Super. 463 (App. Div. 1978), in favor of "a more equitable analysis designed to avoid injustice." *Pop's Cones, Inc. v. Resorts Intern. Hotel, Inc.*, 704 A.2d 1321, 1326 (N.J. Super. App. Div. 1998). Courts have "relaxed the requirement of a clear and definite promise in Restatement (Second) of Contracts § 90 (1979), and held that promissory estoppel requires only '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee.'" *SDK Troy Towers, LLC v. Troy Towers, Inc.*, A-3149-16T3, 2019 WL 612670, at *12 (N.J. Super. App. Div. Feb. 14, 2019) (quoting *Pop's Cones*, 704 A.2d at 1326). Applying this approach, a New Jersey appellate court "permitted [a] plaintiff to proceed with a cause of action for damages flowing from plaintiff's losses based on her detrimental reliance on the promise of employment," even when there was no "clear and definite contract of employment." *Pop's Cones,* 704 A.2d at 1326 (discussing *Peck v. Imedia, Inc.,* 679 A.2d 745 (N.J. App. Div. 1996)).

The FAC satisfies these pleading requirements. By placing the MultiPlan logo on its insurance cards—while knowing that it frequently pays MultiPlan rates to providers who treat patients that have such cards, knowing that such providers have MultiPlan contracts that ban balance billing, and knowing that even when it does not pay MultiPlan rates it still tells patients in EOBs that it has an agreement with the MultiPlan provider that prevents the provider from balance billing the patient—Cigna plausibly promised to honor the MultiPlan rates. The logo plausibly constituted a promise because it showed a "manifestation of intention," or "a ***demonstration*** or display of [its] intent" to pay the MultiPlan rate. *See Tacoma Auto Mall, Inc. v. Nissan N.A., Inc.*,

39

279 P.3d 487, 496 (Wash. App. Div. 2 2012) (emphasis in original) (holding that the plaintiff had not alleged a clear and definite promise because it had not demonstrated such a "manifestation" or "display" of intent). Cigna's arguments to the contrary necessarily raise fact questions that can only be decided at summary judgment, which is why the promissory estoppel cases cited by Cigna were all resolved at or after summary judgment. *See, e.g.*, *id.* (dismissing the promissory estoppel claim only after examining the "evidence adduced at summary judgment" including manifestations of the parties' intent and express acknowledgements between them).

As already detailed above with regard to the negligent misrepresentation claim, the Association Plaintiffs have also plausibly alleged reasonable reliance on Cigna's promises, as reflected in its use of the logo, to pay based on the MultiPlan Contracts.

## CONCLUSION

For the foregoing reasons, the Court should deny Cigna's motion to dismiss.

Respectfully submitted,

DATED: December 23, 2022

/s/ Andrew N. Goldfarb
Elizabeth K. Acee, Esq. (ct 20986)
**BARCLAY DAMON LLP**
545 Long Wharf Drive, Ninth Floor
New Haven, CT 06511
Tel. (203) 672-2659
Fax (203) 654-3260
eacee@barclaydamon.com

Jason S. Cowart, Esq. (ct 23206) (*pro hac vice*)
**ZUCKERMAN SPAEDER LLP**
485 Madison Avenue, 10th floor
New York, NY 10022
Tel. (212) 704-9660
Fax (212) 704-4256
jcowart@zuckerman.com

8524826.1

Andrew N. Goldfarb, Esq. (phv 07743) (*pro hac vice*)
Almas Abdulla (*pro hac vice* pending)
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel. (202) 778-1800
Fax (202) 822-8106
agoldfarb@zuckerman.com

Leslie Howard, Esq. (*pro hac vice* pending)
**COHEN HOWARD, LLP**
766 Shrewsbury Avenue, Suite 200
Tinton Falls, NJ 07724
Tel. (732) 747-5202
lhoward@cohenhoward.com

*Counsel for Plaintiffs and the Putative Class*

8524826.1