**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JILL STEWART, et al., | ) | |
|     *Plaintiffs*, | ) | |
| | ) | 3:22-CV-769 (OAW) |
|     v. | ) | |
| | ) | |
| CIGNA HEALTH AND LIFE INS. CO., | ) | |
| et al., | ) | |
|     *Defendants*. | ) | |
| | ) | |

<u>**ORDER GRANTING IN PART MOTION TO DISMISS**</u>

This action is before the court upon Defendants' Renewed Motion to Dismiss and supporting memorandum ("Motion").[1]  *See* ECF Nos. 49 and 49-1.[2]  The court has reviewed the Motion, Plaintiffs' opposition thereto, *see* ECF No. 59, Defendants' reply in support thereof, *see* ECF No. 68, and the record in this matter and is thoroughly apprised in the premises.  For the following reasons, the Motion is <u>**GRANTED in part.**</u>[3]

I.    <u>**BACKGROUND**[4]</u>

This case arises from Defendants' administration of three different self-funded healthcare plans, each of which was subject to the protections and requirements of the Employee Retirement Income Security Act ("ERISA").  Plaintiffs Stewart and Plumacher,

---

[1] Defendant also filed a motion to seal an exhibit to the Motion, *see* ECF Nos. 47 and 48, respectively, because it contains confidential commercial information.  Pursuant to Local Rule 5(e), the court finds that good cause exists to seal the exhibit, given the sensitive information contained therein.  Docket entry 48 shall remain under seal until further order of the court.

[2] Defendants filed an earlier motion to dismiss and an earlier motion to seal.  ECF Nos. 22 and 24.  An amended complaint mooted those motions, though, and so the court denies them as such.

[3] The court finds that the briefs are thorough and complete and that there is no need for oral argument on the Motion.  Therefore, the request for oral argument is denied.  *See* D. Conn. L. Civ. R. 7(a)(3) ("Notwithstanding that a request for oral argument has been made, the Court may, in its discretion, rule on any motion without oral argument.").

[4] All factual allegations are taken from Plaintiffs' amended complaint.  ECF No. 37.

1

and Ms. Montoya Marin[5] (the "Individual Plaintiffs") were each separately enrolled in an employer-sponsored[6] health insurance plan (the "Plans"), which engaged Defendants to administer claims.   As is common, Defendants negotiated discounted rates ("Cigna Rates") with a number of healthcare providers (the "Contracted Providers"),[7] and the Plans all encouraged participants to see Contracted Providers because doing so would lower costs both to the participants and to the Plans.   Not only were the Cigna Rates lower than the Contracted Providers' regular rates, but Contracted Providers were not permitted to "balance bill" the participants, meaning that they accepted the Cigna Rates as payment in full and were contractually barred from billing the participants for the difference between their normal rate and the Cigna Rate.   Moreover, the Plans reimbursed a substantial percentage (if not all) of the Cigna Rate, such that participants ultimately owed relatively little to Covered Providers.

If a participant saw someone who was not a Contracted Provider, then the Plans reimbursed a much smaller percentage, and then only a percentage of the "Maximum Reimbursable Charge," or "MRC," which was not the actual charge from the provider, but a recalculation of the allowable charge by the Plans by applying a semi-defined formula.[8] So by seeing someone who was not a Contracted Provider, a participant's coverage

---

[5] Ms. Montoya Marin's claims are based on her experience, though they formally are brought by her Attorney-in-Fact, whom she has designated through a Durable Power of Attorney.

[6] Individual Plaintiffs either were employed by the sponsor themselves, or their spouse was employed by the sponsor.

[7] ERISA plans commonly refer to these contracted providers as "in-network" or something similar, but the court has taken pains to avoid using the common terminology because the parties dispute the construction of these terms in the Plan documents.

[8] The court says the formula semi-defined because the Plans list several methods by which the MRC could be calculated, but there is no specification of when one or another methodology will be used.  The Plans all define MRC as the lesser of the charging provider's regular rate for relevant services, or a particular percentile of the average rate for relevant services in the relevant area.  The latter methodology may use a percentile set by the employer (here, the 150th and 200th percentile) and would calculate the average rate in a way similar to that used by Medicare.  Or it might be set by Defendants (at the 80th percentile), and the average rate would derive from database of fees maintained by Defendants.

would be diminished in two ways: by the allowance of the MRC instead of the rate actually charged, and reimbursement of a lower percentage of that MRC.  And in such cases, a participant could be balance-billed the difference between the charged rate and what the Plans reimbursed.

Apart from their arrangement with either the Covered Providers or the Individual Plaintiffs' employers, Defendants also entered into an agreement with Multiplan, LLC ("Multiplan"), a separate entity that contracts directly with providers ("Multiplan Providers") to secure a lower rate for services (the "Multiplan Rate").  This lower rate generally was stated as a percentage of the providers' usual charge for services, such that a provider who had an agreement with Multiplan would accept as full payment only a portion of their usual rate for services.  Defendants issued insurance cards to the Plans' participants that depicted the Multiplan logo.

Individual Plaintiffs all engaged Multiplan Providers to perform certain services, believing that the Plans would reimburse the Multiplan Providers at the Multiplan Rate. The Multiplan Providers believed the same.  And indeed, each Individual Plaintiff was issued an Explanation of Benefits ("EOB") that stated (1) that Defendants had negotiated a significant discount with the relevant provider, (2) that much of the negotiated rate would be reimbursed by the Plan, and (3) that the Individual Plaintiff owed little to nothing to the Multiplan Providers.

The Individual Plaintiffs (and their providers) were rudely surprised later, though, when they learned that the EOBs grossly misrepresented how the claims had been handled.  The only discounts Defendants had negotiated with the Multiplan Providers were the Multiplan Rates, but Defendants did not reimburse the Multiplan Providers at the

Multiplan Rates.  It is not clear what they did with Ms. Montoya Marin's claim (since her appeals were denied summarily, with no additional information), but it appears from responses to Plaintiffs Stewart's and Plumacher's appeals that Defendants had applied the MRC provisions of the Plans,[9] though it remains unclear how Defendants arrived at the numbers reported in the EOBs.  This resulted in the Multiplan Providers receiving only a fraction of what they had charged, leaving them to balance-bill the shortfall to the Individual Plaintiffs.  These bills reached the tens of thousands of dollars.

The American Medical Association ("AMA"), the Medical Society of New Jersey, and the Washington State Medical Association ("WSMA" and together with the other two entities, the "Association Plaintiffs") joined the Individual Plaintiffs in seeking relief from Defendants' practice with respect to Multiplan Providers.  Defendants assert that all the claims are due for dismissal.

## II.  <u>LEGAL STANDARD</u>

It is axiomatic that federal courts have limited jurisdiction and must dismiss actions where subject matter jurisdiction is absent.  *See Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d. Cir. 2011).  Standing is a jurisdictional question, and where it is lacking, so, too, is subject matter jurisdiction.  *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004).  "[T]he plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir.

---

[9] Defendants' final denial of the appeals state that the claims were processed under the MRC provision of the respective Plan, but it is not clear which methodology was used to calculate the MRC.  A third-party vendor (referred to only as "Zelis," with no additional description) apparently revalued the services rendered by the Multiplan Providers and then the Plans paid a portion thereof.

2002).  Failure to carry this burden necessitates dismissal under Federal Rule of Civil Procedure 12(b)(1).

Furthermore, an action must be dismissed where the facts alleged in the complaint are insufficient to state a plausible claim for relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To avoid dismissal under Rule 12(b)(6), a party must plead "enough facts to state a claim to relief that is plausible on its face," and not merely "conceivable."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  When reviewing a motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the nonmovant's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  "[C]ourts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct."  *Id.* (citing *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013)).

## III.  **DISCUSSION**

Individual Plaintiffs assert three ERISA claims.  In Count One, they seek to recover the benefits Defendants have withheld (allegedly in violation of the Plans' terms); they also contend this constitutes a breach of Defendants' fiduciary duties.  Counts Two and Three seek equitable relief unavailable under Count One.

The Association Plaintiffs assert four claims pursuant to New Jersey and Washington state law.  Count Four is a claim for negligent misrepresentation; Count Five alleges tortious interference with the patient-physician contract and/or relationship; Count Six seeks to proscribe Defendants' conduct under a promissory estoppel theory; and in

Count Seven, the AMA and the WSMA assert a violation of the Washington Consumer Protection Act.

Defendants contend all Counts should be dismissed, either because Plaintiffs have failed to state their claims, or because they lack standing to bring their claims.  The court begins with Counts One through Three, the Individual Plaintiffs' claims.

### A. <u>Individual Plaintiffs' Claims</u>

Defendants make three arguments for dismissal with respect to Counts One through Three.  First, that they have treated the Multiplan Providers in accordance with the Plans' terms, and thus that there was no wrongful denial of benefits and no breach of fiduciary duties.  Second, that Individual Plaintiffs lack standing for equitable relief.  And third, that although the complaint names Cigna Corporation as a defendant, it makes no specific allegations against that entity, and therefore these Counts should be dismissed as to Cigna Corporation.

As to the last argument, the court agrees that Counts One, Two, and Three do not state a claim against Cigna Corporation. The Plan documents[10] clearly state that the employers delegated administrative authority to Cigna Health and Life Insurance Company (hereinafter "Cigna"), alone.  Moreover, Plaintiffs do not rebut the argument, so the court deems it admitted.  Accordingly, Cigna Corporation is dismissed from Counts One, Two, and Three.

Next, the court must resolve a preliminary disagreement the parties present regarding their substantive arguments.  Cigna heavily relies upon the terms of its

---

[10] Defendants have attached all three Plan documents to the Motion.  "In the ERISA context, courts routinely hold that plan documents . . . are integral to the allegations in the complaint."  *Guzman v. Bldg. Serv. 32BJ Pension Fund*, No. 22-CV-01916 (LJL), 2023 WL 2526093, at *8 (S.D.N.Y. Mar. 15, 2023). Therefore, it is appropriate to review these documents in disposing of the Motion.

agreement with Multiplan (the "Multiplan Agreement") and a separate online resource, to show that Multiplan Providers are not Covered Providers. Plaintiffs argue that the court should disregard the documents because they are not cited in the complaint or integral to the claims therein. Cigna counters that they are integral to the claims and so the court should review them in disposing of the Motion.

The court agrees with Plaintiffs on this point. It is undisputed that participants in the Plans had no visibility into the terms of the Multiplan Agreement (if they even knew of it at all). Whatever Cigna's obligations to the Multiplan Providers under the Multiplan Agreement, Counts One through Three deal only with its obligations to *Individual Plaintiffs,* which are outlined in the Plan documents. "A claim under an ERISA plan 'stands or falls by the terms of the plan . . . .'" *Cannady v. Bd. of Trustees of Boilermaker-Blacksmith Nat'l Pension Tr.*, No. 20-3141-CV, 2022 WL 151298, at *2 (2d Cir. Jan. 18, 2022) (quoting *Kennedy v. Plan Adm'r for DuPont Sav. and Inv. Plan*, 555 U.S. 285, 300 (2009)). The Plans do not incorporate the Multiplan Agreement, or even reference it, so the Plan terms (which lay out what is due to participants) are unaffected by the Multiplan Agreement terms (which lay out what is due to Multiplan Providers). Similarly, the online resource does not appear to be a Plan document such that it could affect Plan terms. Therefore, the court will not review the Multiplan Agreement or the online resource in connection with Individual Plaintiffs' claims.

Reviewing the Plans themselves, the court finds (and the parties do not dispute) that the relevant terms are substantively the same between the Plans, laying out a cost-saving framework as described supra. The parties dispute the specifics of the Plans' terminology, though. Individual Plaintiffs argue that by the plain terms of all the Plans,

Multiplan Providers qualify as Contracted Providers and ought to be reimbursed as such. Cigna disagrees.

The court agrees with Plaintiffs.  Ignoring Cigna's references to the terms of the Multiplan Agreement, there is little left of their argument in the first instance.  And Individual Plaintiffs point to ample evidence from the Plan documents to support their interpretation of the Plans.  Specifically, while there are minor variations between Plans, each encourages participants to use providers with whom Cigna has contracted a discounted rate, *either directly or indirectly.*  In two of the Plans, this is accomplished by including a "special plan provision" advising participants that if they receive services from "Participating Providers," the plan will pay a greater share of the costs they incur.  ECF No. 49-4 at 7; ECF No. 49-5 at 7.  "Participating Provider" thereafter is defined as a person or entity that "has a *direct or indirect* contractual arrangement with Cigna to provide covered services . . . ."  ECF No. 49-4 at 70; ECF No. 49-5 at 75 (emphasis added).  The remaining Plan says that it will pay more when participants choose "network" providers.  ECF No. 49-6 at 6.  It also states that the "network" "consist[s] of providers . . . affiliated or contracted with Cigna *or an organization on its behalf.*"  *Id.* at 6 (emphasis added).  Individual Plaintiffs assert that Multiplan Providers are entities with whom Cigna has an indirect contractual relationship, and that Multiplan has contracted with Multiplan Providers on Cigna's behalf.  Thus, Individual Plaintiffs argue, Multiplan Providers are Covered Providers.

Aside from arguing that the Multiplan Agreement's terms should alter the interpretation of Plan terms (which the court has addressed supra), Cigna argues that the Plans do not specify what benefits will be paid to "Participating Providers," (they only list

the benefits paid to "In-Network Providers,") and thus the Plan documents do not obligate Cigna to treat Multiplan Providers as "In-Network" for purposes of determining benefits due, even if those providers are "Participating."

The court is not persuaded. At the outset, it must be noted that nowhere in the Plan documents is "In-Network" or "Out-of-Network" defined (although they are often capitalized in the manner of defined terms). However, it is clear through usage that "Participating" and "In-Network" are synonymous. One Plan document states that no referral is needed for a participant to see a gynecologist "in our network," and directs participants to where they can find "participating" gynecologists. ECF No. 49-4 at 9. Elsewhere, this same plan says that clinical trial conducted by "non-participating providers" will be covered at the "In-Network benefit level" in certain circumstances, *id.* at 29, and that the plan will not cover "charges of a non-Participating Provider who has agreed to charge . . . an in-network" rate, *id.* at 45. It also states that seeing a "participating" professional will incur discounted costs, as opposed to seeing a professional "not in network," which will result in higher rates for services. *Id.* at 77. In the other two Plans, it is specified that a "non-participating provider" is synonymous with an "Out of Network" provider. ECF No. 49-5 at 14; ECF No. 49-6 at 8. Cigna's own brief equates the two, arguing that Multiplan Providers cannot qualify as "Participating Providers" when the Multiplan Agreement "makes clear that they do not *participate* in Cigna's *network*." ECF No. 49-1 at 12 (emphasis added). Clearly, "participating" and "in-network" are synonymous. Thus, the court rejects this argument, and finds that Individual Plaintiffs have stated facts sufficient to show, at this point in litigation, that Cigna has

denied them benefits in violation of the Plans' terms.  The Motion is denied with respect to Count One.

Turning to Individual Plaintiffs' accusation of a breach of fiduciary duty, to the extent Cigna argues that there is no underlying ERISA violation to support such a claim, those arguments necessarily are rejected for the reasons just discussed.

Cigna's contention that Individual Plaintiffs cannot use a denial of benefits as the basis for an alleged breach of fiduciary duty is more convincing, but ultimately unavailing. It is generally true that a claim for breach of fiduciary duty cannot be based upon a denial of benefits.  *See Spillane v. New York City Dist. Council of Carpenters*, No. 23-247, 2024 WL 221816, at *3 (2d Cir. Jan. 22, 2024) (upholding dismissal of a claim for breach of fiduciary duty where that claim was duplicative of a claim for recovery of benefits wrongfully denied).  But Individual Plaintiffs also have pled an underlying scheme giving rise to wrongful denials of benefits.  Individual Plaintiffs contend that Cigna violated the Plans' terms for the purpose of increasing the fees it collected from the Plans, since it received a percentage of costs it saved the Plans.  Thus, in refusing to reimburse the Multiplan Providers at the Multiplan Rates, Cigna saved the Plans money (as it points out), but it also enriched itself.  This is not a case where a plaintiff relies upon circuitous logic to make both claims (i.e., that the denial of a benefit is wrongful, and because the denial was wrongful, the fiduciary has breached its duties in denying the benefit).  Rather, Individual Plaintiffs have alleged separate and specific facts which could be relevant to the denial-of-benefit claim, *see, e.g., Velez v. Prudential Health Care Plan of New York, Inc.*, 943 F. Supp. 332, 341 (S.D.N.Y. 1996) (assessing a fiduciary's conflict of interest in connection with a denial-of-benefits claim), but which also could form the basis for an

10

independent claim.  Therefore, the court finds that Individual Plaintiffs have alleged a factual basis sufficient to support a claim of breach of a fiduciary duty.

Cigna's argument that Individual Plaintiffs are not entitled to equitable relief is more convincing, but it also fails.  Individual Plaintiffs clearly have stated claims on behalf of themselves (and on behalf of a class of similarly situated individuals), not the Plans.  Had they intended to state a claim on behalf of the Plans, they would have asserted a claim under Section 1132(a)(2), but they did not.  And while the breach of fiduciary duty described above might have been remedied equitably, the restitution and disgorgement sought by Individual Plaintiffs likely should go to the *Plans,* not to the Individual Plaintiffs. And what's more, Individual Participants no longer are enrolled in the Plans, so it is not clear that they are entitled to injunctive or declaratory relief.

However, at this early stage of litigation, the court does not conclude that Individual Plaintiffs are barred from equitable relief, or that any form of equitable relief they properly may be awarded is available to them under Section 1132(a)(1).  *See, e.g., Dunnigan v. Metro. Life Ins. Co.*, 277 F.3d 223, 227 (2d Cir. 2002) (reversing the dismissal of a claim for interest on late-paid benefits pursuant to Section 1132(a)(3)(B)).  This ultimately may prove to be the case, but Defendants have not so proved thus far.  Accordingly, the Motion also is denied as to Counts Two and Three.

### B. Association Plaintiffs' Claims

In Counts Four through Seven, Association Plaintiffs ask the court to declare that Cigna "violated its legal obligations" and to issue an injunction preventing Cigna from continuing its practice of deciding when to honor the Multiplan Rate.  Defendants argue that the Association Plaintiffs lack standing to bring these claims in the first place, but also

have failed to state them in any event, and therefore Counts Four through Seven must be dismissed.  Association Plaintiffs disagree.

The court finds that standing indeed is lacking, though for a distinct reason than those Defendants set forth.  An association may bring suit on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Nat'l Shooting Sports Found. Inc. v. Malloy*, 986 F. Supp. 2d 118, 122 (D. Conn. 2013) (quoting *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir.2006)) (internal quotation marks omitted).  Defendants argue that Association Plaintiffs seek prospective relief, but have failed to show a threat of future harm, and that their claims necessarily would require participation by the individual members.

The court need not discuss these arguments, though, because the complaint presents a more foundational flaw: the absence of a concrete and particularized injury traceable to Defendants' conduct.  Association Plaintiffs only have associational standing if their individual members independently have standing to sue, meaning that Association Plaintiffs must show that a member could bring these claims because "(1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.*  But the facts alleged do not show that the

Association Plaintiffs' members have suffered or will suffer an injury in fact, nor do they show that Defendants are or will be liable for that injury.

Association Plaintiffs claim that they are injured by (1) the uncertainty they will face when treating patients such as Individual Plaintiffs, and (2) the damage that this uncertainty will inflict upon the relationship between Multiplan Providers and patients with coverage like Individual Plaintiffs'. The court finds both arguments unpersuasive. The "uncertainty" Association Plaintiffs reference appears to be uncertainty as to how Multiplan Providers will be paid, but the court does not find this uncertainty sufficient to establish standing. *See Kola v. Forster & Garbus LLP*, No. 19-CV-10496 (CS), 2021 WL 4135153, at *6 (S.D.N.Y. Sept. 10, 2021) (finding uncertainty about whether a debt was owed insufficient basis to establish an injury in fact). Moreover, this uncertainty does not appear any greater than that inherent in the modern healthcare system, in which providers and patients alike often are unclear as to what the out-of-pocket cost of a particular procedure might be until after a claim is submitted, which claim may be denied by insurers for myriad reasons. Further still, Multiplan Providers can (and apparently do) balance-bill participants when Defendants decline to honor the Multiplan Rates.[11] Thus, there appears to be certainty in how Multiplan Providers can operate their businesses, even where Defendants do not reimburse them at the Multiplan Rate.

With respect to the providers' relationship with their patients, it is unclear that this establishes standing. Even assuming it could, the complaint is too speculative and vague

---

[11] Association Plaintiffs assert that Defendants' practices call into question Multiplan Providers' right to balance-bill, since participants are led to believe, through the faulty EOBs, that they owe nothing to their Multiplan Providers. Again, though, they offer no concrete examples of this difficulty. To the contrary, the complaint shows that Multiplan Providers do balance-bill patients with coverage like Individual Plaintiffs'. That is part of Individual Plaintiffs' injury.

to show injury.  The extent of the alleged injury appears to be that it would be unclear who (the plan or the participant) would be responsible for remitting payment, and at what rate. This merely rehashes the previous argument.  Association Plaintiffs speculate that Defendants' approach to claims from Multiplan Providers may affect Multiplan Providers' willingness to see patients with coverage similar to Individual Plaintiffs', even where there is a preexisting relationship with that patient, but they identify no actual case in which this has occurred.  Again, the court is not convinced that this is appreciably different from a patient seeking services from an out-of-network provider, or from a patient whose insurance has changed such that a provider with whom they have a preexisting relationship is no longer in that patient's network.  Indeed, an insurer's network may change with the same effect.[12]  Still, these are circumstances that providers already navigate.  Thus, the court is not convinced that these alleged injuries are concrete, particularized, and actual enough to show standing.

Even assuming that Association Plaintiffs can show an injury in fact, however, the complaint lacks certain factual allegations essential to establish Defendants' liability for that injury.  Association Plaintiffs assert claims that sound in pseudo-contract, but there are actual contracts that govern Multiplan Providers' relationships with Defendants, the relevant terms of which largely are unknown.  For example, it is unclear what terms Multiplan Providers agreed to with *Multiplan*.  The complaint only asserts that Multiplan

---

[12] Association Plaintiffs cite to *Fairfield Cnty. Med. Ass'n v. United Healthcare of New England*, 985 F. Supp. 2d 262, 268 (D. Conn. 2013), aff'd as modified sub nom. *Fairfield Cnty. Med. Ass'n v. United Healthcare of New England, Inc.*, 557 F. App'x 53 (2d Cir. 2014), which dealt with an insurer's excision of some 2,200 providers from its Medicare Advantage network, as evidence that they have shown an injury in fact.  And it is true that in *Fairfield* the court did find that standing had been established, but there, the court was able to cite to affidavits that concretely laid out the economic loss, reputational harm, and disruption to ongoing treatment that would ensue, plus allegations that the insurer violated both contractual terms and Medicare regulations.  Associational Plaintiffs have offered no concrete examples of future harm, and as will be discussed infra, their pseudo-contractual claims are of uncertain merit.

Providers agreed with Multiplan to accept a certain percentage of their normal rates as full payment for services.  But if Multiplan Providers' agreements with Multiplan otherwise conceive of situations in which a particular plan may or may not honor the Multiplan Rates, then it is unclear that Multiplan Providers experienced any injury at all.  And if Multiplan Providers' agreement with Multiplan do not allow for Multiplan's clients to decline to honor the Multiplan Rates on an ad hoc basis, it is unclear that Defendants are at fault for declining to do so.

Here, the court finds that the Multiplan Agreement is reviewable in relation to Association Plaintiffs' claims, which sound in pseudo-contract and thus necessarily incorporate and rely upon the contracts governing the relationship between Defendants and Multiplan Providers (which is to say, the relationships between Defendants and Multiplan, and Multiplan and Multiplan Providers).  *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (noting that "where the complaint relies heavily upon [a document's] terms and effect," that document is integral to the complaint and therefore reviewable when disposing of a motion to dismiss) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002)) (internal quotation marks omitted).  Also, Defendants clearly negotiated with Multiplan the entitlement to elect, unilaterally, whether or not to honor the Multiplan Rate.  Thus, even if Multiplan Providers' agreements with Multiplan do not address situations as presented here, it is unclear how Defendants can be held liable for exercising an entitlement they fairly negotiated.

Association Plaintiffs attempt to allege a different contractual relationship from which their pseudo-contract claims could arise.  They point to the Multiplan logo on participants' insurance cards, the Plans' terms, and the faulty EOBs to create an

expectancy from which their members might derive some injury ,but they do not explain how Multiplan Providers can claim an injury premised upon communications and agreements between the Plans and *participants* (and with respect to the EOBs, upon communications sent after services already have been rendered).   Further, the court agrees with Defendants that the complaint overstates the significance of the Multiplan logo.   While it seems reasonable to accept that placement of the Multiplan logo on participants' insurance cards indicates that some contractual relationship exists between a Multiplan Provider and Defendants, the court is not persuaded that the logo necessarily indicates that the Plans are obligated to pay the Multiplan Rates.   *See Plastic Surgery Ctr., P.A. v. Cigna Health & Life Ins. Co.*, No. CV172055FLWDEA, 2018 WL 2441768, at *7 (D.N.J. May 31, 2018) ("[W]hile the inclusion of the logo on [the insured's] identification card may indicate some relationship between Multiplan and Cigna, it cannot be plausibly inferred, from the inclusion of the logo alone, that Defendants would reimburse a provider within the Multiplan network at the Multiplan Rate.").   An insurance card never states the particulars of any specific relationship with any specific provider; it merely indicates to a provider that *some* agreement has been reached, not the particulars thereof.   Had Defendants contracted directly with the Multiplan Providers the terms they negotiated with Multiplan, the result would be the same: the providers would be obligated to review the specifics of their agreement with Defendants to know what they could expect to receive for services.   Indeed, anyone who ever has attempted to learn what the cost of medical services will be before incurring them knows that the providers generally are unable to accurately answer that question.   Additional investigation always is required to ascertain what services are covered and at what rate.   Here, that presumably would require

16

inspection of a Multiplan Provider's agreement with Multiplan, though as discussed supra, those terms are unknown to the court.

For these reasons, the court finds that Associational Plaintiffs have failed to establish standing, and consequently the Motion must be granted as to Counts Four through Seven.


IV.   **CONCLUSION**

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1.  The Motion to Seal (ECF No. 47) is **GRANTED.**

2.  The Motion to Dismiss (ECF No. 49) is **GRANTED in part.**

    a.  The motion is denied with respect to Counts One, Two, and Three.

    b.  The motion is granted with respect to Counts Four, Five, Six, and Seven**.**

    c.  Cigna Corporation is dismissed from Counts One, Two, and Three, and therefore from the action entirely.   The Clerk of Court is instructed, respectfully, to please terminate Cigna Corporation from this action.


**IT IS SO ORDERED** in Hartford, Connecticut, this 30th day of March, 2024.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE